[No. 51816-5.   En Banc.   March 12, 1987.]

STEVEN E. CAMPBELL, ET AL, *Appellants,* v. ITE IMPERIAL CORPORATION, *Respondent.*

*Stafford, Frey & Mertel,* by *John G. Cooper* and *Marcus B. Nash,* for appellants.

*Lane, Powell, Moss & Miller,* by *Thomas C. Sorenson* and *John McKay,* for respondent.

*Bertha B. Fitzer* on behalf of Washington Association of Defense Counsel, amicus curiae for respondent.

PEARSON, C.J.—The principal issue in this case is whether the negligence of appellant's employer in failing to warn of or protect appellant from respondent's allegedly unsafe product constitutes an intervening act legally sufficient to operate as a superseding cause? Under the facts of this case, we hold that the employer's negligence does not constitute a superseding cause, and that the trial court

erred in giving a jury instruction on superseding cause.

## I

The facts of this case are largely undisputed. On August 29, 1980, appellant Steve Campbell was working as a wireman with a crew for Snohomish County Public Utility District 1 (PUD) at the 52nd Street substation in Everett. The crew had performed certain maintenance upon the substation over a period of 3 days pursuant to a written switching order, under which certain portions of the substation were de–energized to permit the performance of that maintenance.

The crew completed the scheduled maintenance well in advance of the time expected. Accordingly, the crew contacted Systems Dispatch, a central clearing facility that controls all work being done in the field, to advise Systems Dispatch that the crew had completed the original work, and to secure an additional safety clearance to perform further maintenance on the substation. This additional maintenance included the cleaning of the roof bushings which are situated on top of the metal–clad switchgear.

On the day in question, the cleaning of the roof bushings included: (1) the "main bushings" through which electricity normally is conducted, and (2) the "auxiliary bushings" which normally are not used. Paint overspray and grime had accumulated on the auxiliary bushings, and the crew was instructed to wipe them clean with steel wool.

The substation has certain "feeder lines" which emerge from it to supply power to PUD customers. While the crew performed the scheduled maintenance, electrical power was not flowing through the feeder lines, and PUD customers were being provided power from another substation elsewhere in the district. However, a circuit breaker on one of those feeder lines was closed to allow power to be "backfed" from another substation to the 52nd Street substation for purposes of allowing the crew to use various electrical tools to perform their initial maintenance procedures. This back feeding caused both the main bushings and the auxiliary

bushings to be energized while the initial maintenance was being performed.

The crew foreman contacted Systems Dispatch to de-energize the back–fed circuit so that the crew could safely clean the roof bushings. Following normal procedures, the foreman—in radio contact with Systems Dispatch—went through the standard procedures to de–energize the substation. This consisted of breaking the particular circuit that supplied the back–fed power to the substation, a procedure performed by Campbell. Following this procedure, Systems Dispatch advised the foreman that the crew could test the lines, install their grounds and proceed with their work.

After the crew tested the lines and installed the grounds, Campbell then proceeded to clean the main bushings. Upon completion of that task, and with the approval of his foreman, Campbell walked down the roof of the metal–clad switchgear to the auxiliary bushings. He reached down with a pad of steel wool in his hand to begin cleaning those bushings, only to be jarred by a high–voltage surge of electricity. Campbell was severely injured.

The auxiliary bushings remained energized after going through the normal shutdown procedures because a design feature connected those bushings to a feeder line at a point *beyond* the circuit breaker. As a result, the auxiliary bushings remained energized by the "back feeding" from the other substation providing power to customers. Thus, contrary to what the crew—and apparently Systems Dispatch—believed, the opening of the circuit breaker did not de–energize the auxiliary bushings.

The auxiliary bushing connection to the feeder line was obscured from the workmen's view, and the crew had no knowledge that the bushing was connected in this fashion. This unusual wiring configuration was manufactured by the respondent, ITE Imperial, as part of the switchgear equipment, and was installed under its supervision. ITE Imperial failed to provide any warning that the bushings could remain energized from a source outside the substation after normal shut–down procedures were followed. ITE Imperial

acknowledged, however, that such a warning would not interfere in any manner with the usage or function of the equipment. Immediately after the incident giving rise to Campbell's injuries, the PUD grounded all auxiliary bushings within the system to prevent any such occurrences in the future.

Campbell contends the pertinent switchgear was not reasonably safe without a warning because the auxiliary bushings on which he was injured are wired to the load side of one of the circuit breakers in the switchgear. The PUD, Campbell's employer, allegedly specified this design when it ordered the equipment from respondent. This fact does not appear in the record because the trial court excluded it by order in limine. The court, however, was advised of this fact, and Campbell did not contradict ITE Imperial's representations to this effect until this appeal.

Campbell commenced this action on theories of strict product liability, negligence and breach of warranty. At trial, Campbell elected to proceed solely on the theory of strict liability in tort.[1] Campbell testified as to the facts of the accident, injuries sustained and economic loss. The parties stipulated to the amount and reasonableness of the medical expenses.

Campbell's experts testified that ITE Imperial's product, incorporating a design configuration with the auxiliary bushings connected beyond the circuit breaker, was not reasonably safe unless accompanied by a warning. They also testified that a circuit breaker or switch between the auxiliary bushing and the connection would render the equipment safer, because back feeding from a power source outside the substation could not occur with that switch or circuit breaker open. They testified that such a configuration was both advisable and feasible from the manufactur-

---

[1]Because Campbell commenced this action prior to the effective date of the pertinent provisions of the tort reform act, Laws of 1981, ch. 27, codified at RCW 7.72, we express no opinion on the effect of the act on any aspect of Campbell's case, but note that the act would have no effect on our discussion of superseding cause.

er's standpoint. In fact, some of the other PUD switchgear at the time had such a circuit breaker in place. Finally, they testified that the manufacturer should have provided an insulating cap on top of the auxiliary bushing.

At the close of testimony, the trial court instructed the jury that if Campbell's employer, the PUD, was negligent in failing to discover and warn of the defect and take appropriate precautions, and if the PUD's negligence was "so unanticipated that it can be said to fall without the realm of reasonable foreseeability" by the manufacturer, then the PUD's negligence would constitute a superseding cause, thus relieving ITE Imperial of liability. The jury returned a general verdict in favor of respondent.

Thereafter, the trial court denied Campbell's motion for judgment notwithstanding the verdict on the issue of liability and for a new trial on damages only, or, in the alternative, for a new trial. Campbell appealed directly to this court. We reverse and remand for a new trial on liability and damages.

## II

Campbell's primary contention is that ITE Imperial cannot avoid liability for failing to provide an adequate warning on the switchgear by claiming that the PUD should have protected him from the equipment. According to Campbell, the failure of the PUD to prevent his injury is not, as a matter of law, an intervening act that is legally sufficient to operate as a superseding cause. In short, Campbell argues that the trial court should not have instructed the jury on superseding causation.

Section 440 of Restatement (Second) of Torts (1965) defines superseding cause as "an act of a third person . . . which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." In determining whether an intervening act constitutes a superseding cause, the relevant considerations under Restatement (Second) of Torts § 442 (1965) are, *inter alia,* whether (1) the inter-

vening act created a *different type of harm* than otherwise would have resulted from the actor's negligence; (2) the intervening act was *extraordinary* or resulted in extraordinary consequences; (3) the intervening act *operated independently* of any situation created by the actor's negligence. *Accord, Herberg v. Swartz,* 89 Wn.2d 916, 927–28, 578 P.2d 17 (1978).

Pursuant to § 447(a) of Restatement (Second) of Torts, even if the intervening act of the third person constitutes negligence, that negligence does not constitute a superseding cause if "the actor at the time of his negligent conduct should have realized that a third person might so act". In fact,

> If the likelihood that a third person may act in a particular manner is . . . one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.

Restatement (Second) of Torts § 449 (1965). *See also* Restatement (Second) of Torts § 447, comment on Clause (a) (1965).

In *Herberg v. Swartz, supra,* the owner of a hotel ridden with numerous fire code violations claimed that the negligence of the local fire department was an intervening act which constituted a superseding cause. This court disagreed, stating that the "theoretical underpinning of an *intervening* cause which is sufficient to break the original chain of causation [*i.e.,* constitute a superseding cause] is the *absence of its foreseeability.*" *Herberg,* at 927 (citing *Boeing Co. v. State,* 89 Wn.2d 443, 446, 572 P.2d 8 (1978)); *Maltman v. Sauer,* 84 Wn.2d 975, 982, 530 P.2d 254 (1975); *Fosbre v. State,* 70 Wn.2d 578, 584, 424 P.2d 901 (1967). The court stated further that "insofar as here applicable the question of whether the intervening act is a *superseding* cause depends upon [1] whether it brings about a different kind of harm or [2] whether it operates independently of the situation created by the actor's negligence." *Herberg,* at 928 (citing Restatement (Second) of Torts §§

442–45 (1965)). Although this court enunciated these principles in the context of a negligence action, we can think of no reason why they should not apply with equal force to a product liability action.

In this case, Campbell contends that the lack of an adequate warning near the auxiliary bushing was the proximate cause of his injury. ITE Imperial argues that the PUD's negligence in failing to warn and properly de–energize the auxiliary bushing constituted a superseding cause. The question for this court is whether it was reasonably foreseeable that the PUD would either fail to provide an adequate warning or properly de–energize the substation.

The manufacturer bears responsibility for affixing an adequate warning to its product, *see Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 155, 570 P.2d 438 (1977), and this duty generally is not delegable. *Minert v. Harsco Corp.,* 26 Wn. App. 867, 874, 614 P.2d 686 (1980). Thus, it would be anomalous to hold that an employer's failure to warn constituted a superseding cause. *But see Little v. PPG Indus., Inc.,* 19 Wn. App. 812, 579 P.2d 940 (1978) (failure of employer who has actual knowledge of hazard to warn employees may constitute a superseding cause), *modified,* 92 Wn.2d 118, 594 P.2d 911 (1979). Such a rule might improperly shift the duty of warning to product purchasers. Although such a purchaser might be held jointly liable for breach of its duty to warn, its negligence generally should not relieve the manufacturer of liability for failure to warn. Regardless, we believe the PUD's negligence in failing to warn was reasonably foreseeable.

The PUD's failure to de–energize the auxiliary bushing likewise was foreseeable. In the first place, ITE Imperial had to be generally aware of the PUD's complicated power grid and the likelihood of human failure in de–energizing a particular portion of that grid. More importantly, the very design of the pertinent switchgear *without a circuit breaker* should have led a reasonable manufacturer to conclude that the PUD might fail to de–energize this particular switchgear even after following written shutdown procedures for

that substation. The potential danger associated with power back feed from an alternate source exists with respect to all pieces of switchgear. Unlike other pieces of switchgear in the PUD's system, however, the item manufactured by ITE Imperial does not contain a circuit breaker. Thus, a workman unfamiliar with this particular design might reasonably conclude that the pertinent switchgear is de–energized after opening the circuit breakers on the other substation circuits.

Viewed differently, the intervening negligence of the PUD did not result in a different kind of harm than otherwise would have resulted from ITE Imperial's failure to warn. The harm caused by the PUD's negligence—electrical shock and burns—is identical to the harm brought about by ITE Imperial's failure to warn. Secondly, the intervening negligence of the PUD did not operate independently of the situation created by ITE Imperial's failure to warn. To use this court's language in *Herberg,* the PUD's negligence was "activated" by ITE Imperial's failure to affix a warning to its product.

In fact, this case falls directly within the coverage of § 449 of Restatement (Second) of Torts. Under § 449, even criminal conduct of a third party does not constitute a superseding cause "[i]f the likelihood that a third person may act in a particular manner is . . . . one of the hazards which makes the actor negligent". In this case, the likelihood that the PUD would not properly shut down the auxiliary bushing is the very hazard which makes ITE Imperial's switchgear unreasonably unsafe if unaccompanied by an adequate warning. Accordingly, under § 449 the PUD's negligence does not constitute a superseding cause.

Notwithstanding the foregoing analysis, ITE Imperial argues that *Little v. PPG Indus., Inc., supra,* the first Washington case addressing the applicability of the doctrine of superseding cause to a products liability action, supports a decision favoring ITE Imperial. In *Little,* a workman was overcome by and died from a chemical produced by the defendant. The barrels in which the chemical

was sold contained a warning which the plaintiff alleged was inadequate. Based upon the existence of this warning, together with evidence that the decedent's employer had specific knowledge of the chemical's dangerous propensities and of two prior employee accidents involving the chemical, the court held that the issue of superseding cause based on the employer's negligence should be presented to the jury on retrial. *Little,* at 825.

ITE Imperial relies heavily upon *Little* and other cases involving an employer's failure to warn to justify the jury instruction in this case. There are, however, two important factual differences between *Little* and this case. First, unlike ITE Imperial, the manufacturer in *Little* had "no effective means of communicating its warnings to the ultimate user." (Footnote omitted.) *Little,* at 824. The evidence in *Little* demonstrated that the manufacturer's chemical was pumped out of its barrels into containers belonging to the employer. One could hardly expect the manufacturer to assume responsibility for affixing warnings to every container in which its chemical might be used. In this case, however, ITE Imperial had an effective means of communicating its warning to PUD employees; namely, by affixing an inexpensive warning to the roof of the substation in proximity to the auxiliary bushings.

Furthermore, in *Little,* the employer had actual, specific knowledge that the product was unreasonably unsafe, and that four employees had been overcome by the chemical on two previous occasions. *Little,* at 825. In this case, on the other hand, the record is barren of evidence that the PUD actually knew the switchgear was unreasonably unsafe, and no employee accidents involving this switchgear had ever occurred.

Dean Prosser, upon whom the *Little* court heavily relied, states that "[w]here the buyer is notified of the danger, or discovers it for himself, and delivers the product without warning, it usually has been held that the responsibility is shifted to him, and that his negligence supersedes the liability of the seller." (Footnotes omitted.) W. Prosser, *Torts*

§ 102, at 667–68 (4th ed. 1971). Assuming this court were to adopt this principle, it does not apply to this case. In short, we believe *Little* can and should be distinguished on the grounds that (1) ITE Imperial had an effective means of communicating its warning to PUD employees; and (2) the PUD did not have actual, specific knowledge that the switchgear was unreasonably unsafe.

In sum, we hold that an employer's failure to warn or protect an employee from a product which is unreasonably unsafe, unless accompanied by a warning, does not constitute a superseding cause, unless (1) the employer's intervening negligence created a different type of harm; or (2) the employer's intervening negligence operated independently of the danger created by the manufacturer; or (3) the employer had actual, specific knowledge that the product was unreasonably unsafe and failed to warn or protect. Because there is no such evidence in the record of this case, the trial court erred in giving a superseding cause instruction. Accordingly, we reverse and remand for a new trial. Because we hold that ITE Imperial was not entitled to an instruction on superseding cause, we need not address Campbell's challenge to the superseding cause instruction given at trial.

### III

After the jury returned its general verdict in favor of respondent, Campbell moved the court for entry of judgment notwithstanding the verdict on the issue of liability, and for a new trial on the issue of damages. In the alternative, Campbell also moved for a new trial on all issues. The trial court denied the motions and Campbell contends this was error.

■ With regard to entry of judgment notwithstanding the verdict, the test to be applied in ruling on such a motion was succinctly stated by this court in *Hojem v. Kelly,* 93 Wn.2d 143, 145, 606 P.2d 275 (1980), as follows:

A motion for a judgment n.o.v. should not be granted unless the court can say, as a matter of law, that there is

neither evidence nor reasonable inference therefrom sufficient to sustain the verdict. All evidence must be viewed in the light most favorable to the party against whom the motion is made. *Grange v. Finlay,* 58 Wn.2d 528, 364 P.2d 234 (1961). There must be "substantial evidence" as distinguished from a "mere scintilla" of evidence, to support the verdict—*i.e.,* evidence of a character "which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed." A verdict cannot be founded on mere theory or speculation. *Arnold v. Sanstol,* 43 Wn.2d 94, 98, 260 P.2d 327 (1953).

The *Hojem* court affirmed the trial court's entry of judgment n.o.v. for the reason that, "at best", a mere scintilla of evidence had been presented to support the jury verdict. That is, since substantial evidence did not exist, entry of judgment n.o.v. was proper.

In the present case, the evidence adduced at trial conflicted on the issue of whether the switchgear was unreasonably unsafe unless accompanied by a warning. In particular, ITE Imperial's expert witness testified with respect to the switchgear that: "Safety is related to the usage, and not to its configuration"; and, "[t]he switchgear . . . by design is very safe." Verbatim Report of Proceedings, at 399. Based upon this evidence, the jury might have concluded that the pertinent switchgear was reasonably safe. In short, we believe the jury was presented with sufficient evidence, such that the trial court could not say, as a matter of law, that ITE Imperial was not entitled to the jury's verdict. Therefore, we affirm the trial court's denial of Campbell's motion for judgment n.o.v.

## IV

ITE Imperial cross–appeals the trial court's order in limine rejecting ITE Imperial's proffer of evidence that the pertinent switchgear was manufactured to the PUD's specifications. Interestingly, although ITE Imperial's expert testified that the design was safe, ITE Imperial argues that the fact that the PUD designed the pertinent switchgear is relevant to the issue of the reasonable foreseeability of the PUD's negligence as a superseding cause. Because this evi-

dence was excluded, there is no way for this court to deter-
mine whether the PUD actually did design the switchgear.

■ In any event, participation by the PUD in the design
of the product in this case should not relieve ITE Imperial
of the duty to warn where a warning is required. A claim
for injury resulting from design defect is distinct from a
claim of harm resulting from a failure to warn. Should the
manufacturer be found liable for the absence or inadequacy
of a warning, it may seek contribution from the designer for
the defective design. This, however, has nothing to do with
a plaintiff's cause of action. In short, because the PUD's
failure to warn or protect Campbell is, at best, a concurring
rather than a superseding cause, the design origin is irrele-
vant.

Accordingly, we affirm the trial court's refusal to give
ITE Imperial's instruction 16. We hold, under the facts of
this case, that admission of design origin was not relevant
to the issue of whether ITE Imperial's product is unreason-
ably unsafe unless accompanied by a warning, and might
have confused the jury by intimating that the PUD's fault
can relieve ITE Imperial of liability for its failure to warn.
We affirm the trial court's refusal to give ITE Imperial's
instruction 15 that an employer's knowledge that a product
is dangerous relieves a manufacturer from liability for fail-
ure to warn because there is no evidence that the PUD had
actual, specific knowledge that the switchgear was unrea-
sonably unsafe.

## V

ITE Imperial also cross–appeals the trial court's refusal
to give ITE Imperial's instruction 14 on assumption of risk.
According to ITE Imperial, it is entitled to this instruction
on remand because there is evidence in the record that
Campbell knew there always was the possibility of unex-
pected energy in PUD equipment. ITE Imperial's position
is untenable.

■ In a strict liability case, assumption of the risk oper-
ates as a damage–reducing factor rather than a complete

bar to recovery. *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 75, 684 P.2d 692 (1984) (citing *South v. A.B. Chance Co.,* 96 Wn.2d 439, 635 P.2d 728 (1981)). An assumption of risk instruction is proper when there is substantial evidence that the plaintiff knew of the specific defect causing his injury. *Davis,* at 75–76 (citing *Klein v. R.D. Werner Co.,* 98 Wn.2d 316, 318, 654 P.2d 94 (1982)).

In this case, it is uncontroverted that Campbell was not aware of either the configuration of the 52nd Street substation, or the fact that the auxiliary bushing was energized. As an experienced wireman, working with high voltage on a daily basis, Campbell surely was aware of the general dangers, but obviously was unaware that the auxiliary bushing would remain energized after opening the circuit breakers. To conclude that Campbell was aware of the specific defect in this configuration would be tantamount to believing that he intended to commit suicide. *See Pearson v. Hevi–Duty Elec.,* 618 S.W.2d 784, 790 (Tex. Civ. App. 1981). Thus, we hold the trial court properly refused ITE Imperial's instruction 14 because there is not substantial evidence that Campbell touched the auxiliary bushing with specific knowledge that the bushing was energized.

UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, and DURHAM, JJ., concur.

GOODLOE, J. (dissenting)— Appellant Steven Campbell has suffered a tragic accident and survived the long painful recovery process with remarkable courage and dignity. I share with the majority an appreciation for the frustration he must feel at the circumstances which caused this unfortunate event. Nevertheless, I must dissent, because I do not believe the facts of this case demonstrate any liability on the part of respondent ITE Imperial Corporation.

The majority principally holds that an industrial purchaser's failure to discover and protect its employees from an undisclosed product defect does not as a matter of law constitute a superseding cause so as to relieve the product

manufacturer from liability. If this holding were applicable to the actual facts of this case, I would have no trouble joining the majority opinion. But in construing the facts, the majority mischaracterizes the nature of the intervening negligence and overlooks the fact that any "defect", if it existed, was fully known to Campbell's employer, the Snohomish County Public Utility District (PUD). The facts here indicate that the negligence of Campbell's employer consisted of far more than a mere failure to discover, warn or protect. The PUD was negligent in that it failed to follow proper clearance procedures for working on electrical equipment; it gave Campbell an affirmative go–ahead to work on particular equipment without adequately checking its schematics to verify that the equipment was de–energized. These actions, in violation of PUD policy and state administrative safety standards, were not so patently foreseeable that one can say as a matter of law they did not break the causal chain. This is particularly true given that the alleged "defect" in this case consisted of the lack of a warning sign or extra protective features on a certain wiring configuration, the layout of which was fully known to the PUD, and that it was the PUD's duty to understand such configurations before giving clearance commands.

I would hold that the trial court did not err in instructing the jury on superseding cause and would affirm the jury's verdict for ITE Imperial. I would hold that the *sole* proximate cause of Campbell's injuries was the negligence of the PUD. Given that the majority remands this case, I would also hold that evidence tending to prove that the PUD was in fact the designer of the equipment in question is relevant and admissible on retrial.

I

ADDITIONAL FACTS

Before commencing my argument I wish to clarify certain facts. The majority assumes as a basis for its holding that the PUD did not have "actual, specific knowledge" of the alleged product defect. Yet the defense was denied the

opportunity to introduce evidence which would have tended to prove such knowledge by showing that the wiring configuration in question had been designed by the PUD. Even without such evidence, the record establishes that the PUD had full knowledge of the wiring design. Systems Dispatch, the PUD unit responsible for formulating switching orders and issuing work clearances, has a board in its office depicting the entire electrical scheme in the service district and indicating all disconnections to be made before any equipment can be safely touched. A dispatcher uses this board in formulating written switching orders, after which another dispatcher or the supervisor must double-check the order against the board. Thus, those responsible for issuing clearances in the PUD had at their fingertips full information regarding the 52nd Street substation. Had the dispatchers been doing their job properly, they would not have failed to notice that the auxiliary bushings were still energized.

Nothing in the record indicates that the wiring configuration in question was so unusual as to confuse Systems Dispatch. Indeed, there was testimony indicating that at the time of Campbell's injury, the PUD had anywhere from 10 to 20 other substations wired in similar fashion. There was also testimony indicating that substations are wired in many different ways and that it is the responsibility of the PUD to understand these wiring systems. From this information, a jury could easily have concluded that the PUD had actual, specific knowledge of any dangers presented by the 52nd Street substation's wiring design.

The majority states that the PUD went through "normal procedures" to de-energize the roof bushings and other equipment at the 52nd Street substation. Majority opinion, at 810. Yet the record indicates that the procedures utilized were far from normal. Under normal PUD procedures, a clearance defines the envelope of the area that has been de-energized to permit work. Here, the dispatcher initially gave clearance that the 52nd Street substation had been de-energized. This information was inaccurate because the

auxiliary bushings inside the substation remained energized from an outside source. No danger was created by this first instruction since Campbell's crew intended to work for a few days solely on the transformer and yard switches. For this purpose, power was temporarily backfed into a portion of the substation through the closing of circuit breaker 12–186. When, however, the transformer work was completed, the crew requested an additional clearance to perform maintenance work on the substation switchgear and bushings. The dispatcher than told the crew to reopen breaker 12–186, test their lines, install grounds and proceed. This second instruction created a danger since the crew was still operating under the information that the entire substation had been de–energized except for the closure of breaker 12–186. This instruction was also inaccurate in that the dispatcher failed to take proper steps to de–energize the auxiliary bushings or to inform the crew that the auxiliary bushings remained energized. In short, both the general instruction that the entire substation had been de–energized (prior to the closure of breaker 12–186) and the subsequent specific clearance to work on the roof bushings (after the reopening of breaker 12–186) failed to adequately define the envelope of area in which one could safely work.

These errors on the part of Systems Dispatch violated not only internal PUD policy but also the safety rules issued by the Washington State Department of Labor and Industries for electrical workers. WAC 296–45. The state safety rules require that "[b]efore considering any line or equipment to be de–energized, the power dispatcher shall assure himself that all switches which could possibly energize the line or equipment in question have been opened". WAC 296–45–65023(11). And further, "[i]n giving a clearance, the power dispatcher shall make certain that the man to whom the clearance is given is fully aware of [its] extent or . . . limits". WAC 296–45–65023(15). A jury would be justified in concluding from the record that the PUD violated state safety requirements when it gave Campbell clearance to work on energized bushings.

The facts indicate that other safety regulations were also violated. The rules state that following a clearance all equipment must be tested and grounded before the workman can proceed; where grounding is impracticable, the equipment must be worked on as if it were still energized. WAC 296–45–65025(1), (7)(c). Campbell and his crew grounded only the bus lines connected to the main bushings; they did not test or ground the auxiliary bushings nor did they treat them as if they were energized. A witness testified that a single ground would normally be adequate where one believes that the entire section of equipment to be worked on is dead. Under the facts of this case it is questionable whether Campbell would be justified in forming this belief. The rules specify that groundings must be placed on *both sides* of a section of line on which work is to be done, although a one–sided grounding may be adequate where the other side has a visible disconnect opening and there is no other source of feed. WAC 296–45–65025(12)(a). Here, testimony established that the workman out in the field cannot see how the auxiliary bushing is wired unless he looks at a chart inside the switchgear compartment. This suggests that Campbell's crew violated state regulation when it proceeded to work on the auxiliary bushings without examining its charts for the possible existence of other feeds or setting up a separate ground. Although a plaintiff's contributory negligence is not a defense in a strict liability case, *see Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 157–59, 570 P.2d 438 (1977), the negligence of Campbell's foreman and crew members in not requiring a ground is significant because it goes to the question of superseding cause.

## II
### Superseding Cause
Superseding cause is a relevant factor in determining legal causation, which is a necessary element of a tort suit premised on either negligence or strict liability. *See Baughn v. Honda Motor Co.,* 107 Wn.2d 127, 142, 727 P.2d

655 (1986). The requirement that a tort plaintiff prove legal along with factual causation rests on policy considerations as to how far the consequences of a defendant's acts should extend. *Baughn,* at 146; *Hartley v. State,* 103 Wn.2d 768, 779, 698 P.2d 77 (1985). The doctrine of superseding cause insulates defendants from liability for injuries which do not occur as a part of the natural and continuous sequence of events flowing from their acts. *Pratt v. Thomas,* 80 Wn.2d 117, 119, 491 P.2d 1285 (1971).

The majority correctly states that the key question in determining whether an intervening act may operate as a superseding cause is its foreseeability, see majority opinion, at 813; only those intervening acts which are not reasonably foreseeable will break the causal chain. *Boeing Co. v. State,* 89 Wn.2d 443, 446, 572 P.2d 8 (1978); *Cook v. Seidenverg,* 36 Wn.2d 256, 264, 217 P.2d 799 (1950). However, the majority appears to forget that questions of foreseeability, like those of causation generally, are normally for the jury to decide. *Kennett v. Yates,* 41 Wn.2d 558, 564–65, 250 P.2d 962 (1952); *see generally Petersen v. State,* 100 Wn.2d 421, 435–36, 671 P.2d 230 (1983); *Bordynoski v. Bergner,* 97 Wn.2d 335, 340, 644 P.2d 1173 (1982). Only when reasonable minds would not differ on the foreseeability of an intervening negligent act should the court decide superseding cause issues as a matter of law. *Smith v. Acme Paving Co.,* 16 Wn. App. 389, 397, 558 P.2d 811 (1976). The instruction on superseding cause was proper in this case because reasonable minds could conclude that the PUD's gross negligence in failing to properly follow its own clearance procedures was not reasonably foreseeable to ITE Imperial. *See Minert v. Harsco Corp.,* 26 Wn. App. 867, 875, 614 P.2d 686 (1980).

The majority relies on *Herberg v. Swartz,* 89 Wn.2d 916, 928, 578 P.2d 17 (1978), which held *as a matter of law* that a defendant whose negligence caused a fire to spread could reasonably foresee that others would act negligently in responding to the disaster. This leads the majority to conclude that it was error to instruct on superseding cause in

this case. However, in *Herberg* the court reasoned that any negligence on the part of the fire fighters was foreseeable because the defendant's fire code violations created the necessity for the fire fighters' intervention. *Herberg*, at 928. Here, by contrast, the PUD's duty to give proper clearance instructions was not made necessary by any failure on the part of ITE Imperial to affix a warning to its product; the PUD's duty existed with respect to *all* electrical equipment, regardless of whether the equipment carried a special warning. Contrary to the majority's assertions, the PUD's negligence was not "activated" by ITE Imperial. See majority opinion, at 815. The record indicates that clearance instructions are formulated from the dispatch board and not from a physical inspection of equipment on site. Had a warning sign been posted, the dispatcher's instructions to plaintiff would still have been the same.

*Herberg* is also distinguishable on another ground. In *Herberg*, there was no allegation that the intervening negligence was anything other than ordinary negligence. There were no allegations, for example, that the fire fighters' intervening negligence jeopardized human safety or violated state law. In this case by contrast, the PUD's failure to exercise due care in issuing clearance instructions can be considered gross negligence. Gross negligence is characterized by extreme carelessness of action in situations involving grave potential harm. *Nist v. Tudor*, 67 Wn.2d 322, 331, 407 P.2d 798 (1965). That a sophisticated electrical utility would violate state safety regulations at the risk of fatal injury to its workers is so extraordinarily negligent as to be well beyond the realm of reasonable foreseeability. *See McLaughlin v. Mine Safety Appliances Co.*, 11 N.Y.2d 62, 71, 181 N.E.2d 430, 226 N.Y.S.2d 407 (1962); *see also* Restatement (Second) of Torts § 447(c), comment *g* (1965) (extraordinary negligence may constitute a superseding cause even where ordinary negligence would not).

The majority cites three factors from Restatement (Second) of Torts § 442 (1965) to be used in determining whether an intervening act constitutes a superseding cause:

whether the intervening act (1) created a different type of harm than that which would otherwise have resulted, (2) was extraordinary or resulted in extraordinary consequences, or (3) operated independently from any situation created by the original actor. Majority opinion, at 813. To the limited extent these Restatement factors have been applied in this state, they are subsidiary to the key issue, which is foreseeability. *See Herberg*, at 927–28. In any event, applying these criteria to the case in question can only lead to a finding of superseding cause.

The Restatement defines an extraordinary act or consequence as one that is "[not] normal in view of the circumstances existing at the time of its operation" and defines independent operation as that which is "not a normal result of [the] situation". Restatement (Second) of Torts § 442(b), (c) (1965). It can hardly be said that the PUD's violation of state law and internal procedure was "normal" or that such negligence was a normal consequence of any situation created by ITE Imperial. As explained above, the PUD's failure to adequately define the scope of plaintiff's clearance resulted from causes extrinsic to the lack of a warning sign on the auxiliary bushings.

The majority finds that the type of harm caused by the PUD—electric shock—was identical to that allegedly brought about by ITE Imperial. This is an oversimplification. Identity of harms can never alone be enough to negate the existence of a superseding cause. One must look beyond the type of harm as to how the harm is caused. Otherwise, an automobile manufacturer's liability for installing faulty brake lights which created a risk of collision could not be superseded by the negligence of a third party who hits the car owner head–on. Or, a manufacturer's liability for constructing a leaky boat which created a risk of drowning could not be superseded by the negligence of a third party who causes the plaintiff to fall overboard. Clearly before one can compare similarity of harms, it must first be established that the harm was in fact attributable to the original, nonintervening actor. This showing has never been made in

this case. The posting of a warning sign on the auxiliary bushings would not have made any difference where both Systems Dispatch and Campbell's work crew failed to follow proper procedures for issuing clearances and testing and grounding equipment. Nor would the placement of an extra circuit breaker or other safety features on the switchgear in question have prevented plaintiff's accident where Systems Dispatch did not sufficiently consult its dispatch board before issuing a clearance. An extra circuit breaker would have made a difference only if Systems Dispatch was aware that the auxiliary bushings were still energized. Systems Dispatch, however, did not take the steps necessary to draw this conclusion. Campbell has simply failed to produce facts which show that but for ITE's failure to provide warnings or extra safety features on its equipment, this injury would not have occurred. This is more properly an element of factual, or "but for", causation, as opposed to legal causation. *See, e.g., Baughn v. Honda Motor Co.,* 107 Wn.2d 127, 142, 727 P.2d 655 (1986). Yet without this preliminary showing that the lack of a warning sign *in fact* caused plaintiff's harm, it makes little sense to ask if this harm was the same as that attributable to the PUD. See also footnote 2, *infra.*

Restatement (Second) of Torts § 449 (1965), on which the majority also relies, is similarly inappropriate here. Section 449 relates only to cases where "the likelihood that a third person may act in a particular manner is . . . one of the hazards which makes the [original] actor negligent". In this case, ITE Imperial's failure to affix a warning sign did not create a likelihood that the PUD would act negligently, since it is the dispatcher's duty to understand the electrical circuitry regardless of warning signs. Nor can I agree with the majority that the absence of a circuit breaker in the pertinent switchgear increased the likelihood of human error. There was expert testimony at trial that safety relates to usage and not design. From this, the jury could have reasonably concluded that this configuration was no more likely to induce human error than any of the other

complicated wiring schemes commonly purchased by the PUD. Contrary to the majority's assertions, a workman in the field does not base his assumptions about safety on the presence of circuit breakers; he concludes equipment is safe only after Systems Dispatch has given proper clearance and he or his crew has adequately tested and grounded the lines. A warning sign or extra circuit breaker in this case would have resulted in no different order from Systems Dispatch.

The proper rule to apply in this case is that applied by the Court of Appeals in *Little v. PPG Indus., Inc.,* 19 Wn. App. 812, 579 P.2d 940 (1978), *modified on other grounds,* 92 Wn.2d 118, 594 P.2d 911 (1979): Where plaintiff's employer has actual knowledge of the hazards inherent in the use of the product and fails to pass on such knowledge to its employees, the defendant–manufacturer is entitled to a jury instruction on superseding cause. *Little,* at 825; *accord, Reed v. Pennwalt Corp.,* 22 Wn. App. 718, 723–25, 591 P.2d 478, *aff'd,* 93 Wn.2d 5, 604 P.2d 164 (1979).

The court in *Little* observed an important distinction between a simple failure to inspect and discover a defect and an active failure to notify another of a danger of which an intermediate buyer is aware:

> The effect, as a matter of "proximate cause," of negligence on the part of an intermediate buyer of the product, has arisen in several cases. There is general agreement that the seller may reasonably anticipate that the buyer may fail to inspect the goods and discover their defects before he delivers them to the plaintiff, and that this or any other foreseeable negligence of the buyer, or of his employees, or indeed of any other person, will not relieve the seller of liability.
>
> *On the other hand, it is ordinarily not reasonably to be expected that one who knows that a chattel is dangerous will pass it on to another without a warning. Where the buyer is notified of the danger, or discovers it for himself, and delivers the product without warning, it usually has been held that the responsibility is shifted to him, and that his negligence supersedes the liability of the seller . . . .*

*Although there have been few decisions, there is
every reason to expect that the same conclusions, in
general, will be reached when strict liability is in
question.*

(Italics ours. Footnotes omitted.)

*Little,* at 823–24 (quoting W. Prosser, *Torts* § 102, at 667–68 (4th ed. 1971)). This distinction is relevant in the present case. The PUD's negligence was not, as the majority claims, a mere failure to inspect and discover. Rather the PUD's negligence consisted of an active failure to notify its employees of the fact ·that the auxiliary bushings were wired to an outside source.

Of importance to the holding in *Little* was the fact that the intermediate buyer in that case was a "large industrial concern" with its own safety programs and methods of distributing the product to its employees. *Little,* at 824. Under such circumstances, the court reasoned the employer could reasonably be expected to communicate to its employees its knowledge of any danger. *Little,* at 825; *accord, Reed,* at 724. This factor is likewise relevant here. Although the PUD does not "distribute" electrical equipment to its employees, it controls the means of access through its clearance procedures. Thus, it would be reasonable for ITE Imperial to expect that the PUD would inform its employees of any dangers inherent in the 52nd Street substation wiring configuration.

The majority attempts to distinguish *Little* on two grounds. It argues first that ITE Imperial differs from the manufacturer in *Little* because ITE Imperial had an "effective means of communicating its warning to PUD employees", and second, that the PUD did not have actual, specific knowledge that its product was "unreasonably unsafe". Majority opinion, at 816. These distinctions are unconvincing. With respect to the latter contention, *Little* does not require knowledge that a product is unreasonably unsafe—a legal definition—but merely that the employer be aware of the dangers inherent in its use. *See Little,* at

825. There is no doubt that the PUD was aware of the dangers of electricity. As for the former argument, the manufacturer's ability to effectively communicate warnings to the ultimate user is just one of several factors to be used in determining whether superseding cause analysis is appropriate. Other factors include the availability of employer safety programs, the employer's knowledge of how to use the product safely, and whether the employer has exclusive control over the product's use. *See Reed,* at 718. Here, these other factors are clearly present. Furthermore, I fail to see that ITE Imperial had an effective means of communicating to Campbell. The posting of a warning sign on the auxiliary bushings would not have stopped Campbell from touching them once Systems Dispatch gave the instruction to proceed.[2]

Other jurisdictions have followed the rule enunciated in *Little* and *Reed. Compare McLaughlin v. Mine Safety Appliances Co.,* 11 N.Y.2d 62, 71, 181 N.E.2d 430, 226 N.Y.S.2d 407 (1962) *with Rosebrock v. General Elec. Co.,* 236 N.Y. 227, 241, 140 N.E. 571 (1923). Where a purchaser possesses actual knowledge of the inherent danger in a product and passes the product on to another without a warning, the jury is entitled to an instruction on superseding cause. *McLaughlin,* at 71 (citing *Foster v. Ford Motor Co.,* 139 Wash. 341, 246 P. 945, 48 A.L.R. 934 (1926)); *accord, Boeing Airplane Co. v. Brown,* 291 F.2d 310, 318–19 (9th Cir. 1961); *Stultz v. Benson Lumber Co.,* 6 Cal. 2d 688,

---

[2]Appellant offered at trial a hypothetical warning sign with the words "Danger—Bushings May Be Energized From Outside Source". Exhibit 7. This sign would convey little if anything that appellant did not already know. All experienced wiremen know that any piece of electrical equipment may be energized from any source. It is for this reason that they must rely on a central clearance unit along with testing and grounding procedures to ensure that the equipment they work on has been de–energized. Moreover, the sole cause of appellant's accident was his assumption, based on misinformation from the dispatcher, that the main and auxiliary bushings were identically wired. Thus, a sign referring only to "bushings" would have done little good when the dispatcher informed appellant that the bushings were de–energized.

59 P.2d 100 (1936); *Catlin v. Union Oil Co.,* 31 Cal. App. 597, 161 P. 29 (1916); *Olds Motor Works v. Shaffer,* 145 Ky. 616, 621, 140 S.W. 1047 (1911). Application of the rule in *Little* to the present case would not improperly shift the duty of warning from manufacturers to product purchasers. Rather it would ensure the effectiveness of such warnings by recognizing a duty in those purchasers who have knowledge of a product's dangers and who possess exclusive control over access to the product to convey that knowledge to their subordinates and transferees.

Because I would uphold the trial court's giving of a superseding cause instruction, I will address appellant's further contention that the instruction was inadequate. The pertinent language in the court's instruction 8 is as follows:

> However, if you find that the Switchgear was not reasonably safe or that defendant failed to give an adequate warning to make the product reasonably safe, and also find that a proximate cause of the occurrence was a later independent intervening negligent act of the P.U.D. or its employees, in that the intervening act was so unanticipated that it can be said to fall without the realm of reasonable foreseeability, then the defendant's conduct is superseded by the intervening negligent act and is not the proximate cause of the alleged injury.

Clerk's Papers, at 49.

Instructions are sufficient if they permit each party to argue its theory of the case, are not misleading, and, when read together with other instructions, properly inform the trier of fact of the applicable law. *Crossen v. Skagit Cy.,* 100 Wn.2d 355, 360, 669 P.2d 1244 (1983). The superseding cause instruction given in this case was based upon Washington Pattern Instruction 12.05 and is nearly identical to that upheld in *Boeing Co. v. State,* 89 Wn.2d 443, 446, 572 P.2d 8 (1978). The instruction properly informed the jury that in order for any negligence on the part of the PUD to supersede the defendant's liability, it would have to fall outside the realm of reasonable foreseeability. The jury was not misled; this was a correct statement of the applicable law. *See Boeing Co.,* at 446.

## III
### Design Specifications

I also disagree with the majority's ruling in part IV of its opinion that the trial court properly excluded evidence that the pertinent switchgear was manufactured in accordance with design specification provided by the PUD. This evidence should have been admitted—and ought to be allowed on remand—because if true, it would relieve ITE Imperial from liability for the alleged design defects, including the alleged failure to warn. Such evidence would also have tended to prove PUD's knowledge of the wiring configuration and was therefore relevant to the issue of superseding cause.

It is well established that a manufacturer who produces a product solely in accordance with the purchaser's plans and specifications cannot be held liable for any defect in design, unless the plans are so obviously dangerous that no reasonable manufacturer would follow them. *Moon v. Winger Boss Co.,* 205 Neb. 292, 299–300, 287 N.W.2d 430 (1980); *McCabe Powers Body Co. v. Sharp,* 594 S.W.2d 592, 595 (Ky. 1980); *Castaldo v. Pittsburgh–Des Moines Steel Co.,* 376 A.2d 88, 90 (Del. 1977); *Taylor v. Paul O. Abbe, Inc.,* 516 F.2d 145, 147 (3d Cir. 1975); *Garrison v. Rohm & Haas Co.,* 492 F.2d 346, 351 (6th Cir. 1974); *Spangler v. Kranco, Inc.,* 481 F.2d 373, 375 (4th Cir. 1973); *Littlehale v. E.I. du Pont de Nemours & Co.,* 268 F. Supp. 791, 802 n.16 (S.D.N.Y. 1966), *aff'd,* 380 F.2d 274 (2d Cir. 1967). In holding that a manufacturer could not be held strictly liable for a design defect in a dolly manufactured in accordance with the specifications of plaintiff's employer, the Sixth Circuit aptly stated: "To hold [the manufacturer] liable for defective design would amount to holding a non–designer liable for design defect. Logic forbids any such result." *Garrison,* at 351. If the PUD was in fact the designer of the relevant switchgear, ITE Imperial should not be held liable.

The majority nonetheless holds that evidence as to the PUD's role as designer was properly excluded because a claim premised on design defect is distinct from a claim

premised on failure to warn. Yet here the majority overlooks the fact that this case involves alleged design defects—*e.g.*, the failure to provide an extra circuit breaker. As to the design defects claim, such evidence is clearly relevant.

Furthermore, design defect and failure to warn cases are not entirely distinct. Under the pre–tort reform act law which governs this case, see footnote 1, both design defect and failure to warn claims are based on the Restatement (Second) of Torts § 402A (1965), under which the central question is whether the product at hand is not reasonably safe. *Teagle v. Fischer & Porter Co.*, 89 Wn.2d 149, 154–55, 570 P.2d 438 (1977). Washington's new tort reform act also recognizes this similarity between design defect and failure to warn cases. *See* RCW 7.72.030(1). The new law is instructive in that it exempts from liability for injuries resulting from either design defects or failures to warn any "product seller that did not participate in the design of a product and [who] constructed the product in accordance with the design specifications of the claimant or another product seller". RCW 7.72.010(2).

The Sixth Circuit in *Garrison* recognized that a manufacturer who merely produces in accordance with the specifications of another should not be held liable for an alleged failure to warn, at least under circumstances where the manufacturer was unaware of the product's intended use and any danger created thereby, and where the danger was known to the plaintiff's employer who furnished the design. *See Garrison*, at 352. This rule makes sense since a purchaser who furnishes design specifications for a product to be used in a particular fashion is in a better position than the manufacturer to know what dangers will confront the ultimate user. If the PUD in fact designed the wiring system for the 52nd Street substation, it had the superior knowledge by which to provide warnings to its employees. ITE Imperial knew the system would be used for electricity, but it did not know exactly how the PUD would choose to run electricity through the wires since electrical systems

can be energized in infinite possible patterns. Nor could ITE Imperial have known that the PUD would allow its employees to touch its equipment without adequately testing and grounding the lines.

It is true that some courts have held that a manufacturer of defective component parts is not immune from liability merely because the purchaser specified the overall design. *See, e.g., Parkins v. Van Doren Sales, Inc.,* 45 Wn. App. 19, 24–25, 724 P.2d 389 (1986) (applying tort reform act); *Union Supply Co. v. Pust,* 196 Colo. 162, 170, 583 P.2d 276 (1978). However, in these cases the defective component parts were designed by the manufacturer; thus, the manufacturer was for all practical purposes the "designer". *See, e.g., Moon,* at 298–99 (construing *Union Supply Co. v. Pust, supra*). Nowhere do such cases say that evidence as to design origin is irrelevant and inadmissible at trial. In fact, these cases turn on the very issue of who was responsible for the critical design. Without more evidence as to the respective roles of ITE Imperial and the PUD in producing the wiring configuration, there is no way of knowing who was the real "designer". This evidence should have been admitted.

In sum, I do not agree with the majority that the design origin of the equipment "has nothing to do with a plaintiff's cause of action." Majority opinion, at 819.[3] Design origin is relevant to both responsibility and knowledge, and the purchaser's knowledge of the danger is a crucial factor in determining whether the purchaser's conduct may constitute a superseding cause.

## CONCLUSION

For the reasons discussed above, I would affirm the jury

[3]The majority finds the design origin irrelevant in part because the manufacturer "may seek contribution from the designer". Majority opinion, at 819. It may not be that easy. Assuming that the PUD participates in industrial insurance, RCW 51.04 *et seq.,* it will be immunized from suit by ITE Imperial for its negligent conduct toward Campbell unless it has entered into an indemnity agreement with ITE Imperial. *See Seattle–First Nat'l Bank v. Shoreline Concrete Co.,* 91 Wn.2d 230, 242–43, 588 P.2d 1308 (1978).

verdict for the respondent. Given that the majority is remanding this case, I would hold that evidence as to the design origin of the product is admissible at trial.

CALLOW, J., concurs with GOODLOE, J.