IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| REBECCA WEST, an individual,<br><br>Respondent,<br><br>and<br><br>TAMI MATSON, an individual; TIFFANY HAMAN, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>RIDE THE DUCKS INTERNATIONAL, LLC, a foreign company; RIDE THE DUCKS OF SEATTLE, LLC, a Washington company;<br><br>Appellants,<br><br>and<br><br>ERIC BISHOP and JANE DOE BISHOP, and their marital community,<br><br>Defendants. | No. 80257-7-I<br>(Consolidated<br>with No. 80258-5-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Rebecca West was sightseeing aboard an amphibious "Stretch Duck" vehicle (Duck 6) on September 24, 2015, when it was involved in a catastrophic collision with a charter bus on the Aurora Bridge in Seattle. The collision occurred when Duck 6's front axle housing fractured at the connection point between the steering knuckle ball and the axle housing, causing the driver's

Citations and pin cites are based on the Westlaw online version of the cited material.

side front wheel to come off. Duck 6 was owned and operated by Ride the Ducks of Seattle (RTDS), which had purchased it from the manufacturer, Ride the Ducks International (RTDI), in 2005.

About two years before the collision, in October 2013, RTDI issued a service bulletin to its franchisees and licensees, including RTDS, directing them to implement a "collar modification" to strengthen the axle housing on Stretch Ducks. RTDS did not implement the collar modification. By the time RTDI issued the service bulletin, it had observed five axle housing fractures on Stretch Ducks over a period of approximately 10 years.

West later sued RTDI and RTDS. Against RTDI, West alleged claims under Washington's Products Liability Act (WPLA), chapter 7.72 RCW. Against RTDS, West alleged negligence. A jury found both defendants liable and apportioned 60 percent fault to RTDI and 40 percent fault to RTDS.

On appeal, RTDI contends the trial court erred by (1) denying RTDI's motion for judgment as a matter of law on three of West's WPLA-based theories; (2) not giving a superseding cause instruction; and (3) not adding RTDI's proposed clarification to the jury instruction on West's post-sale failure-to-warn claim. RTDS contends the trial court erred by (1) denying RTDS's motion for judgment as a matter of law; (2) admitting evidence that RTDS breached its common carrier duty of care by not implementing the collar modification; (3) admitting evidence of staffing and disorganization issues in RTDS's maintenance department; and (4) admitting West's testimony about why she was wearing a boot on her foot during trial.

We hold that because the medical cause of the problem with West's foot was a matter requiring specialized knowledge, and because West was not qualified to testify as to that matter, the trial court erred by admitting West's testimony about why she was wearing a boot. But this error does not require reversal, and we otherwise discern no error. Accordingly, we affirm.

BACKGROUND

Facts

Amphibious "DUKW" vehicles were originally designed and built by GMC for use by the U.S. military to move cargo from ship to shore during World War II. After the war, a company called Ozark Scenic Tours in Branson, Missouri, began using parts from surplus DUKW vehicles to build tour vehicles, which it then used to operate tours in Branson. RTDI's parent company later purchased and renamed Ozark Scenic Tours, and consistent with the parties' briefing, we refer to the company hereinafter as "RTDI" regardless of the time frame. RTDI had tour franchises in Branson; Philadelphia; Newport, Kentucky; Stone Mountain, Georgia; San Francisco; and Guam. Additionally, it had licensees in Boston and Seattle. Unlike franchisees, RTDI's licensees were independent companies that owned the vehicles they purchased from RTDI, and in exchange for a percentage of sales, obtained the right to use certain RTDI intellectual property and resources. RTDS was the licensee in Seattle.

RTDI produced and sold four distinct editions of tour vehicles. Duck 6 was a second-generation "Stretch Duck." To build a Stretch Duck, RTDI would refurbish an original DUKW chassis and "stretch" it by cutting it and adding 15

3

inches of frame. RTDI would then mount a hull fabricated from new steel onto the chassis.

The axle assemblies that RTDI used for the Stretch Ducks were refurbished 1945-era axle assemblies from GMC's postwar military truck, the M135/M211. RTDI would obtain the M135/M211 axle assemblies from surplus auctions or other secondhand sources and remanufacture them. An axle assembly includes the axle housing, which is a protective steel shell that encases the axle and to which the suspension is attached.

Each wheel end of the axle assembly is covered with a watertight "boot" designed to keep water out of the axle assembly. The boot covers the connection point at each end of the axle assembly between the axle housing and the steering knuckle ball.

RTDI began building Stretch Ducks in 1996 and produced a total of 57. Chris Herschend, RTDI's president, later testified that he was aware of no evidence indicating that RTDI ever conducted any engineering or metallurgical analysis in connection with its production of Stretch Ducks.

On July 8, 2003, a driver in Branson observed that the right front axle housing on a Stretch Duck had broken at the knuckle ball. RTDI did not conduct any causation analysis but attributed the fracture to a 1998 incident in which that Stretch Duck's hand brake was not properly set, and the Stretch Duck ran over a retaining wall. No injuries were associated with the July 2003 fracture.

In the 2003-2004 time frame, RTDI observed that the left front wheels on two of its parked Stretch Ducks were canted inward (i.e., toward the engine) at

4

the top.  According to a later summary of the incident, "[u]pon further inspections and examinations, it was determined that the axle housings were fractured along the bottom of the housing between the knuckle ball and where the axle ends were pressed into and welded to the housings."  In 2004, RTDI began welding a small section of pipe to the bottom of the knuckle ball to bridge the gap between the knuckle ball and the axle housing.  This process is referred to throughout the record as the "tab repair" or "tab fix."

The tab fix was developed by RTDI's previous owner, and later RTDI employees testified they did not know exactly what it was intended to do.  But Frank English, RTDI's manager of fleet operations and safety, testified that he believed the tab fix was implemented to address the issue with wheel canting.  Duck 6, which RTDI built in 2004, had the tab fix.  RTDI sold Duck 6 to RTDS in early 2005.

On July 27, 2013, a Stretch Duck with 34 passengers on board experienced an axle housing fracture while on a tour in Branson.  The Stretch Duck was moving slowly at the time, and although the driver reported that the Stretch Duck had lost its left front wheel, no one was injured.  RTDI concluded the fracture was the result of a 2012 incident when that Stretch Duck was turned onto its left side during a tornado then lifted back onto its wheels by a crane.  English later testified that RTDI did not conduct any kind of failure analysis or consult with an engineer in reaching this conclusion; RTDI reached its conclusion "immediately" when it recognized that it was the same Stretch Duck involved in the tornado incident.

5

On August 10, 2013, RTDI inspected another of its Stretch Ducks in Branson and observed that the left front wheel was canted inward at the top. According to a later summary of the incident, "RTDI determined that the axle housing was fractured between the knuckle ball and where the axle end is pressed into and welded into the housing." Additionally, that Stretch Duck had previously undergone the tab fix. English later testified that because this time there was no reason for the canting that RTDI was aware of, RTDI decided to issue a "service bulletin" to "[m]ake sure it never happened again."

On October 1, 2013, RTDI issued a service bulletin numbered SB-00-14-13. The bulletin's stated reason for release was "[t]o avoid axle fractures and to strengthen the connection where the knuckle housing ball connects to the axle housing." The bulletin directed the reader to weld a metal "collar" into the gap between the axle housing and the steering knuckle ball (collar modification). The bulletin's stated urgency was: "As soon as practical and prior to operating 2014[.] Until such time this bulletin is reconciled all maintainers are to add the daily visual inspection of the front wheels."[1] The daily inspection was described as

---

[1] At oral argument, RTDI's counsel argued the service bulletin clearly stated that the collar modification needed to be implemented at the end of the 2013 season and before the 2014 season. RTDI's counsel suggested the urgency of the bulletin was therefore clear because RTDS's 2013 season would have ended in the fall. Wash. Court of Appeals oral argument, *Rebecca West v. Ride the Ducks International LLC*, No. 80257-7-I (April 15, 2021), at 7:30-7:44, 8:06-8:08, 8:26-8:45, *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?eventID=2021041060. We note this is not consistent with the record: Eric Bishop, an RTDS driver, testified that RTDS operates year round; Joe Hatten, RTDS's maintenance manager, testified that "into the colder months" RTDS would still run one or two vehicles on a day-to-day basis; Brian Tracey, RTDS's president, testified there was a busy and a slow

6

follows:

> Due to the axle knuckle boots covering the connection in question[,]
> the visual detection of a failing axle housing is not possible[.]
> However during visual examination with the (front wheels straight)
> you identify a wheel or wheels as being (vertically canted) the Duck
> should be removed from service the damaged axle housing
> removed (scrapped) and replaced with an axle housing that has
> been modified in accordance with this Service Bulletin[.]

RTDI posted the service bulletin to "Duck Central," RTDI's resource-sharing portal to which both licensees and franchisees had access. Herschend later testified that posting documents to Duck Central would generate an email to franchisees and licensees. English testified that the service bulletin was also discussed on biweekly maintenance conference calls, which RTDI hosted as an "open forum" for franchisees and licensees to "discuss pretty much anything." RTDS representatives would sometimes, but not always, participate in those calls.

Ryan Johnson, RTDS's director of operations, received the service bulletin from RTDI and, on October 24, 2013, forwarded it to Joe Hatten, RTDS's maintenance manager, and Isaac Hoffman, RTDS's shop foreman. Hatten later testified that RTDS was not equipped to conduct the welding called for in the service bulletin and that the bulletin "generated more questions than answers." According to Hatten, he relayed his concerns to Johnson with the understanding that Johnson would discuss them with RTDS's president and then get back to Hatten about what was going to be done. Hatten later testified that he never

_____

season; and Herschend testified that RTDS ran year round, though he could not remember when that began.

7

heard back from Johnson about how to proceed. Meanwhile, Johnson testified that once he passed the service bulletin along to RTDS's maintenance department, he left it to their discretion whether to carry it out. In any case, RTDS did not implement the service bulletin, and according to an email Johnson wrote to his assistant in December 2013, RTDS "ha[d] not done a large majority of the Service Bulletins because [Johnson] was only notified they existed 2year[s] ago and to be honest we have a lot of work on our plate and S[ervice] B[ulletin]s tend to go on the back burner."

During the tour season, RTDS drivers would complete an inspection at the beginning of each tour day. That inspection included checking whether the wheels were canted inward. The driver would also complete a post-trip inspection at the end of the day. In conducting their inspections, the drivers would utilize and complete a checklist on a daily vehicle inspection report (DVIR), which included a "Driver Comments" section where drivers could record comments. At the end of the tour day, a mechanic would review the DVIR for driver comments and conduct another inspection. These daily inspections did not include removing the boot covering the connection point between the axle housing and the steering knuckle ball; Hatten testified that the boot typically was removed only annually to inspect the axle housing during the off-season.

On September 24, 2015, RTDS driver Eric Bishop was assigned to Duck 6. He completed a pre-drive inspection at the "Duck Nest," the Ballard facility where RTDS kept its vehicles. He then drove Duck 6 to downtown Seattle to pick up tour passengers near the Space Needle. Among those passengers was

Rebecca West, who was visiting Seattle from Montana, West's friend Tami Matson, and Matson's daughter, Tiffani Haman. The three were seated toward the rear of the vehicle.

The tour made its way through downtown Seattle, then approached the Aurora Bridge on its way to a boat ramp near Gas Works Park, where it would enter the water. Bishop later recalled that Duck 6 would have been approaching the Aurora Bridge, around 10:30 or 11:00 that morning, in the far right of three northbound lanes. Bishop then moved Duck 6 left into the center lane as the right lane ended. Bishop recalled that "[i]t was a beautiful day," traffic was light, and nothing about Duck 6 seemed out of the ordinary as it approached the bridge.

Bishop testified that when Duck 6 was on the bridge deck, Bishop heard and felt a "clunk-clunk," and then Duck 6 "gently veered off to the right." Bishop gently bumped the steering wheel to bring Duck 6 back on course. He testified that as he started to do that,

> there was a very hard, uncommanded left turn. The Duck made a super sharp turn, she started to turn, I was standing on the brakes the best I could with both feet, and I was pulling for all my life to get that thing not to turn, and that steering wheel was like buried in cement. It didn't budge. I was a passenger. . . . I had no control.

Bishop then looked up and "saw a black and white wall," which was the side of an oncoming charter bus. Duck 6 collided with the bus. Bishop recalled a "loud crash" and "glass flying everywhere." West and Matson were ejected from Duck 6 and landed on the pavement. The undisputed cause of the collision was that Duck 6's axle housing had fractured at the connection point between the knuckle

9

ball and the axle housing.

West was taken via ambulance to the emergency department at Swedish Ballard Hospital. West's medical expert, Dr. Virtaj Singh, later diagnosed West with a head injury and scalp laceration that required staples, a chronic cervical sprain, a right-hip injury with a persistent seroma,[2] a chronic right ankle sprain, fractures in her right fourth and fifth toes, and post-traumatic stress disorder.

It is undisputed that before the September 2015 collision, RTDI was not aware it was subject to regulation by the National Highway Transportation Safety Administration (NHTSA) as a vehicle manufacturer. It also is undisputed that RTDI did not comply with federal reporting requirements with regard to the prior axle housing fractures or follow NHTSA's recall process with regard to the October 2013 service bulletin. After the September 2015 collision, RTDI issued a formal recall.

Procedure

On March 17, 2016, West, Matson, and Haman sued RTDI and RTDS.[3] Against RTDI, the plaintiffs alleged products liability claims under the WPLA. Specifically, the plaintiffs alleged that RTDI was liable for construction defect, design defect, failure to warn at the time of sale, and post-sale failure to warn. Against RTDS, the plaintiffs alleged negligence; specifically, breach of the duty of

---

[2] According to Singh, a seroma is an inflamed sack that remains after the blood products from a hematoma or blood-filled bruise, have left.

[3] The plaintiffs also sued Bishop. Although it is unclear from the record when this occurred, RTDI represents that all three plaintiffs settled with Bishop before trial, and none of the plaintiffs' claims against Bishop are at issue in this appeal.

a common carrier.[4]

On February 9, 2017, the trial court consolidated the plaintiffs' case with 21 other cases arising from the September 24, 2015 accident solely for pretrial matters. The other cases included an existing consolidated case involving the "Dinh Plaintiff Group." That case was the first to go to trial, in fall of 2018, before the same trial judge who later presided over the instant case. Among the witnesses who testified during that trial were English and Brian Deckard, RTDI's general manager. The Dinh Plaintiff Group prevailed at trial, and RTDI and RTDS appealed.[5] That appeal was voluntarily dismissed in August 2019 after the parties settled.

Turning back to the instant case, on April 25, 2019, RTDS moved in limine to exclude "[a]ny statement that RTD[S] . . . had a duty as a common carrier to implement the service bulletin collar fix . . . as inaccurate and misleading." RTDS asserted, "Under Washington law, a common carrier is only required to adopt approved appliances that are in general use and necessary for the safety of passengers." It contended the collar modification was not approved, not in general use, and not necessary for passenger safety and, thus, "the parties should be precluded from suggesting that RTD[S] . . . had a duty as a common carrier to implement the collar." The trial court denied the motion, saying, "I can't

---

[4] It is undisputed that RTDS was a common carrier vis-à-vis West, Matson, and Haman. A common carrier is "[a] commercial enterprise that holds itself out to the public as offering to transport freight or passengers for a fee." BLACK'S LAW DICTIONARY 264 (11th ed. 2019).

[5] See Ride the Ducks September 24, 2015 Aurora Bridge Collision, No. 79693-3-I (Wash. Ct. App.).

say as a matter of law that RTD[S] didn't have the duty to implement the service bulletin."

RTDS also moved to exclude "[r]eferences to mechanical issues other than those related to stretch duck axle housings . . . as irrelevant and improper propensity evidence."  It argued that "[e]vidence of maintenance issues not central to this case would result in generally characterizing RTD[S] . . . as having maintenance and safety problems," and "[t]his general characterization would then improperly encourage the jury to find fault on that basis or to infer that [RTDS] must have done something wrong regarding Duck 6's axle housing."  The trial court ruled as follows:

> I see argument from [RTDS] that they didn't have to put this collar fix on because it didn't meet the standard of approved appliances, and I also see a pretty good argument from [RTDI] that that's not why it wasn't put on. . . . [A]nd everybody gets to fight this out.  It's a fair defense and can be fairly attacked.  Between the context of the bigger question of did [RTDS] meet the duty of the common carrier to these plaintiffs, and they are entitled to explore why they think you didn't, including the background context of what was going on in your shop. . . . *I don't want to get into the specific incidences of things that weren't repaired.*  I don't think anybody does. . . . It's a waste of time and it's irrelevant. *But I do think the overall situation in [RTDS's] shop allegedly, that's fair game for plaintiffs, and it's fair game for [RTDI].*

(emphasis added).

The jury was sworn on May 8, 2019.  Testimony began the next day and continued through June 3, 2019.  Witnesses included Bishop; Herschend; Johnson; Hoffman; RTDS's president, Brian Tracey; Singh; Hatten; Matson; Haman; West; West's husband; West's counselor; and Dr. James Rousso, a defense medical expert.  Additionally, excerpts of Deckard and English's

12

testimony from the Dinh Plaintiff Group trial were played for the jury in lieu of live testimony.

On May 21, 2019, RTDI moved for judgment as a matter of law on three of the plaintiffs' WPLA-based theories: design defect, construction defect, and failure to warn at the time of sale.[6]  RTDI asserted that judgment as a matter of law was warranted because the plaintiffs "have not presented, and will not be presenting," any evidence that Duck 6 "was not reasonably safe as designed *at the time of its manufacture* or not reasonably safe in construction *at the time it left the control of RTDI*."  That same day, plaintiffs' counsel notified the court that Haman and Matson's claims had resolved, thus leaving only West's claims for consideration.

On May 29, 2019, RTDS also moved for judgment as a matter of law.  It argued, as it had in its earlier motion in limine, that as a common carrier, its duty was limited to adopting "approved appliances that are in general use and necessary for the safety of passengers."  It asserted that judgment as a matter of law was proper because there was no evidence the collar modification was approved or necessary for passenger safety, and even if RTDS had a duty to implement the collar modification, "no evidence at trial would support a finding that the modification would have prevented the accident."

The trial court denied both motions.

---

[6] RTDI styled its motion as a motion for directed verdict.  We refer to the motion as a motion for judgment as a matter of law in keeping with the 1993 amendments to CR 50.  See 14A DOUGLAS J. ENDE, WASHINGTON PRACTICE: CIVIL PROCEDURE § 24:2, at 72 (3d ed. 2018).

The jury reached a verdict on June 11, 2019.  It found that RTDS was negligent by breaching the duty of a common carrier and that RTDI was liable under the WPLA for construction defect, design defect, failure to warn at the time of sale, and post-sale failure to warn.  It found both RTDS's negligence and RTDI's breach of its duties under the WPLA to be proximate causes of West's injuries and apportioned 60 percent fault to RTDI and 40 percent fault to RTDS.  And, the jury awarded West noneconomic damages of $4 million.

On July 8, 2019, the trial court entered judgment on the verdict.  Both RTDI and RTDS appealed, and their appeals were consolidated.  Additional facts relevant to the issues raised on appeal are set forth below in the discussion of those issues.

DISCUSSION

RTDI's Appeal

On appeal, RTDI argues the trial court erred by (1) denying RTDI's motion for judgment as a matter of law; (2) not instructing the jury on superseding cause; and (3) not giving RTDI's proposed clarification to the jury instruction on West's post-sale failure-to-warn claim.  As further discussed below, each argument fails.

A.  *Judgment as a Matter of Law*

RTDI asserts that for West to establish her claims of design defect, manufacturing defect, and failure to warn at the time of sale, West was required to prove that Duck 6's axle housing was defective when RTDI remanufactured it in 2004.  RTDI contends that West was unable to make such a showing without expert testimony and, thus, the trial court erred by denying RTDI's motion for

14

judgment as a matter of law on those claims. We disagree.

Under CR 50, "[i]f . . . a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find . . . for that party with respect to that issue," then the court may grant judgment as a matter of law against that party "on any claim . . . that cannot under the controlling law be maintained without a favorable finding on that issue." CR 50(a)(1).

"A motion for judgment as a matter of law admits the truth of the opponent's evidence and all reasonable inferences that can be drawn from it." Tapio Inv. Co. I v. State, 196 Wn. App. 528, 538, 384 P.3d 600 (2016). " 'Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party.' " Id. (quoting Sing v. John L. Scott, Inc., 134 Wn.2d 24, 29, 948 P.2d 816 (1997)). " 'Substantial evidence is said to exist if it is sufficient to persuade a fair-minded, rational person of the truth of the declared premise.' " Guijosa v. Wal-Mart Stores, Inc., 144 Wn.2d 907, 915, 32 P.3d 250 (2001) (quoting Brown v. Superior Underwriters, 30 Wn. App. 303, 306, 632 P.2d 887 (1980)).

We review de novo a trial court's decision on a motion for judgment as a matter of law. H.B.H. v. State, 197 Wn. App. 77, 85, 387 P.3d 1093 (2016).

It is undisputed that RTDI is a "product manufacturer" under the WPLA.[7] A product manufacturer is liable to a claimant if, as relevant here: (1) "the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed" (design defect); (2) "the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was . . . not reasonably safe because adequate warnings or instructions were not provided" (failure to warn at the time of sale); or (3) "the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction" (construction defect).  RCW 7.72.030(1), (2).

A plaintiff seeking to establish a manufacturer's liability under RCW 7.72.030 may do so in two distinct ways.  Soproni v. Polygon Apartment Partners, 137 Wn.2d 319, 326, 971 P.2d 500 (1999).  "On the one hand, a plaintiff may attempt to establish liability by showing that, at the time of manufacture, the likelihood that the product would cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighed the manufacturer's burden to design a product that would have prevented those harms and any adverse effect a practical, feasible alternative would have had on the product's usefulness."  Id. (citing Falk v. Keene Corp., 113 Wn.2d 645, 654, 782 P.2d 974 (1989); RCW 7.72.030(1)(a)).  "This is the so-called 'risk utility

---

[7] " 'Manufacturer' includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer."  RCW 7.72.010(2). " 'Product' means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce."  RCW 7.72.010(3).

16

test.' " Soproni, 137 Wn.2d at 326. "Alternatively, a plaintiff may employ the 'consumer expectations' test, which requires the plaintiff to show that the product was 'unsafe to an extent beyond that which would be contemplated by the ordinary consumer.' " Id. at 326-27 (citing Falk, 113 Wn.2d at 654; RCW 7.72.030(3)).

The consumer expectations test recognizes that certain situations exist where the type of accident itself may establish a defect:

> "In the type of case in which there is no evidence, direct or circumstantial, available to prove exactly what sort of manufacturing flaw existed, or exactly how the design was deficient, the plaintiff may nonetheless be able to establish his right to recover, by proving that the product did not perform in keeping with the reasonable expectations of the user. When it is shown that a product failed to meet the reasonable expectations of the user the inference is that there was some sort of defect, a precise definition of which is unnecessary. If the product failed under conditions concerning which an average consumer of that product could have fairly definite expectations, then the jury would have a basis for making an informed judgment upon the existence of a defect."

Pagnotta v. Beall Trailers of Or., Inc., 99 Wn. App. 28, 37, 991 P.2d 728 (2000) (quoting Bombardi v. Pochel's Appliance & TV Co., 10 Wn. App. 243, 247, 518 P.2d 202 (1973)). Relevant considerations under the consumer expectations test include " '[t]he relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk.' " Falk, 113 Wn.2d at 649 (quoting Seattle-First Nat'l Bank v. Tabert, 86 Wn.2d 145, 154, 542 P.2d 774 (1975)). Additionally, " '[i]n other instances the nature of the product or the nature of the claimed defect may make other factors relevant to the issue.' " Id. (quoting Tabert, 86 Wn.2d at 154). That said, liability is not to be imposed "simply because a product causes harm." Pagnotta, 99 Wn.

17

App. at 37.

Applying the foregoing standards, we conclude that the evidence was sufficient to overcome RTDI's motion for judgment as a matter of law even in the absence of expert testimony. Pagnotta is instructive. In February 1994, Austin Pagnotta was hauling diesel fuel south from Spokane in a Beall trailer he bought in October 1993. Id. at 30. The road was dry, the weather was clear and cold, and the road was straight. Id. Pagnotta suddenly felt a tug, as if someone was pulling on the trailer. Id. He tried to steer against the pull but had no control. Id. The trailer went off to the right, pulling the tractor after it. Id. The investigating officer concluded that the back end of the trailer came out of alignment causing the trailer to leave the road without any fault on Pagnotta's part. Id. at 31. In reaching this conclusion, the officer interviewed one witness who said the trailer suddenly jerked to the right and then went off the road, and another witness who said the trailer's axle dropped off the highway to the right and then did a complete flip, landing on the left side of the tractor and trailer. Id. An insurance examiner also concluded the accident was the result of some kind of failure in the trailer's rear axle. Id.

Pagnotta sued Beall for his injuries, claiming products liability and negligence. Id. at 32. Beall filed a third-party complaint against Reyco, which manufactured the trailer's suspension components. Id. at 30, 32. Reyco moved for summary judgment and submitted a declaration from an expert who opined there was no evidence to suggest any of the relevant suspension parts failed before the accident. Id. at 32. In opposition to Reyco's motion, Pagnotta offered

both the investigating officer and insurance examiner's depositions.  Id.  The trial court granted Reyco's motion, concluding that neither the investigating officer nor the insurance examiner was qualified under ER 702 to offer an opinion about the cause of the accident.  Id. at 32-33.

On appeal, this court reversed.  Id. at 29.  In so doing, we held that although neither the investigating officer nor the insurance examiner was a professional engineer or metallurgist, their testimony "would be partly helpful in the lay sense under ER 701 and in the expert sense under ER 702" based on the training and qualifications they did have.  Id. at 34-35.  We also held that when determining the existence of a defect applying the consumer expectations test, "expert testimony of the exact defect is not required as a matter of law."  Id. at 39. We reversed summary judgment, explaining, "A juror does not need to fully know through expert testimony how a trailer suspension is designed or exactly operates to understand the alleged defect."  Id.

Here, as in Pagnotta, a juror did not need to fully know how an axle housing is designed or operates to understand the alleged defect, i.e., that the connection point between the axle housing and the steering knuckle ball could fail due to fatigue, causing the wheel to come loose.  Furthermore, English testified that losing a wheel during a fully loaded tour was something that "shouldn't happen"; Herschend testified that the fact that the Stretch Duck's axle housing could fracture constituted a defect; Hoffman testified that an axle housing fracture occurring while a Duck was in operation would lead to a catastrophic accident; and Johnson testified that if he knew a Stretch Duck's axle

19

housing could unexpectedly fail and that the wheel could fall off, he would take it out of service. From this evidence, a reasonable juror could find that Duck 6's axle housing fracture constituted a failure " 'under conditions concerning which an average consumer of that product could have fairly definite expectations,' " and thus, the jury had " 'a basis for making an informed judgment upon the existence of a defect.' " Id. at 37 (quoting Bombardi, 10 Wn. App. at 247). Therefore, the trial court did not err by applying the consumer expectations test and denying RTDI's motion for judgment as a matter of law.

RTDI disagrees and argues, relying on Heaton v. Ford Motor Co., 248 Or. 467, 435 P.2d 806 (1967),[8] that expert testimony was required because "[t]he susceptibility of failure of an axle housing that was remanufactured 60 years after its original manufacture and then installed on an amphibious-tour vehicle and used heavily for another 10-plus years simply is not within common knowledge or experience." But RTDI's argument fails because RTDI did not manufacture the *original* axle housing. Rather, it manufactured a vehicle whose axle housing unexpectedly failed while doing exactly what RTDI built it to do: take passengers on tours. Furthermore, Heaton is distinguishable. There, the plaintiff appealed from the dismissal of his claims arising from an incident where the wheel on his truck failed about 35 miles after striking a 5- to 6-inch diameter rock. Heaton, 248 Or. at 469. The Oregon Supreme Court affirmed the dismissal, writing, "High-speed collisions with large rocks are not so common . . . that the average

---

[8] Heaton was cited with approval in Bombardi. See Bombardi, 10 Wn. App. at 246-47.

person would know from personal experience what to expect under the circumstances. *Nor does anything in the record cast any light upon this issue.* The jury would therefore be unequipped, either *by general background or by facts supplied in the record*, to decide whether this wheel failed to perform as safely as an ordinary consumer would have expected." Id. at 473 (emphasis added). Here, by contrast, the testimony in the record was sufficient for the jury to find that Duck 6 did *not* perform as safely as an ordinary consumer would have expected. Also, it is within a lay person's general background knowledge that an axle housing on a 10-year-old vehicle should not suddenly fail. Heaton is not persuasive.

RTDI next argues that the trial court erred because West "failed to establish either of the required threshold facts to invoke the consumer-expectation test." RTDI's argument fails for three reasons.

First, RTDI cites Pagnotta and Potter v. Van Waters & Rogers, Inc., 19 Wn. App. 746, 578 P.2d 859 (1978), for the proposition that to invoke the consumer expectation test, "[t]he plaintiff must establish two threshold facts: (1) the incident must be of a kind that ordinarily does not occur absent a product defect and (2) the product must have been materially in the same condition as when it left the manufacturer." But neither Potter nor Pagnotta so holds. Rather, Potter and Pagnotta merely establish that the nature of the incident and the condition of the product are circumstances the jury may consider in determining whether a product performed in keeping with consumer expectations. See Potter, 19 Wn. App. at 753 (observing, in reversing the defendants' motion for

summary judgment, that the allegedly defective rope at issue was recently delivered, appeared new, and was used only once—yet broke the next day while being used in a normal fashion); Pagnotta, 99 Wn. App. at 38 (" 'When the jury reasonably can find that the product is unchanged from the condition it was in when sold and the unusual behavior of the product is not due to any conduct on the part of the plaintiff or anyone else who has a connection with the product, logic dictates that it is a distinct possibility that there is some defect in the product.' " (quoting Brownell v. White Motor Corp., 260 Or. 251, 258, 490 P.2d 184 (1971)); cf. Falk, 113 Wn.2d at 649 (nature of product or nature of claimed defect may dictate what factors are relevant to the issue of an ordinary consumer's reasonable expectations).

Second, even if West were required to show that Duck 6's axle housing fracture was a kind of incident that ordinarily does not occur in the absence of a defect, there was as discussed, sufficient testimony for the jury to so find.

Finally, even if West were required to show that Duck 6 was materially in the same condition as when it left RTDI, we are unpersuaded by RTDI's contention that continued use—much less use for exactly the purpose for which Duck 6 was designed—constituted a material change in condition. Rather, the testimony already discussed was sufficient for a jury to find that Duck 6's continued use was not a *material* change vis-à-vis an axle housing failure. Indeed, even RTDI's own service bulletin recommended the collar modification for *all* Stretch Ducks without consideration for age or use. And other than continued use, RTDI points to no evidence that there was an alternate

mechanical explanation for Duck 6's axle housing failure.  Cf. Potter, 19 Wn.

App. at 752 (" 'It is the law that the plaintiff must establish with reasonable

certainty a manufacturing defect as a cause of the accident . . . . In attempting so

to do, if the evidence shows that the injury is equally or else with reasonable

certainty attributable to other probable causes, he must also exclude such other

causes.  *But in so doing he is not compelled to meet conjecture or mere*

*possibilities with proof to the contrary*.' " (emphasis added) (quoting Kuster v.

Gould Nat'l Batteries, 71 Wn.2d 474, 485, 429 P.2d 220 (1967)).

*B.  Superseding Cause Instruction*

RTDI next contends that there was substantial evidence to support a

finding that RTDS's failure to implement the collar modification was a

superseding cause of the accident and, thus, the trial court erred by refusing to

instruct the jury on superseding cause.  We disagree.

"Jury instructions are sufficient when they allow counsel to argue their

theory of the case, are not misleading, and when read as a whole properly inform

the trier of fact of the applicable law."  Bodin v. City of Stanwood, 130 Wn.2d 726,

732, 927 P.2d 240 (1996).  "Where substantial evidence supports a party's

theory of the case, trial courts are required to instruct the jury on the theory."

Taylor v. Intuitive Surgical, Inc., 187 Wn.2d 743, 767, 389 P.3d 517 (2017).

We review a trial court's decision whether to give a jury instruction " 'de

novo if based upon a matter of law, or for abuse of discretion if based upon a

matter of fact.' "[9]  Id. (quoting Kappelman v. Lutz, 167 Wn.2d 1, 6, 217 P.3d 286 (2009)).

Here, each of the WPLA based liability theories that West asserted against RTDI required West to establish proximate cause.  See RCW 7.72.030(1) ("A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided."); RCW 7.72.030(2) ("A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was not reasonably safe in construction.").

"Proximate cause is composed of both cause in fact and legal cause." Meyers v. Ferndale Sch. Dist., 197 Wn.2d 281, 289, 481 P.3d 1084, (2021). "[T]he cause in fact inquiry focuses on a 'but for' connection, [while] legal cause is grounded in policy determinations as to how far the consequences of a

---

[9] In a footnote, RTDI characterizes as "puzzling" our Supreme Court's statements that refusing an instruction based on a factual dispute is reviewable only for abuse of discretion.  RTDI asserts "the weight of authority from the federal courts favors de novo review of the sufficiency of the evidence to warrant instructing on a theory," and it likens the analysis to an appellate court's de novo review under CR 50(a) of whether the evidence is sufficient to support a verdict. RTDI App. Br. at 34 n.21.  Additionally, RTDI has filed a motion to submit supplemental briefing in support of its assertion that that the trial court abuses its discretion if it refuses to instruct on a theory that is supported by substantial evidence.

We do not consider this assertion because, as discussed below, RTDI was not entitled to a superseding cause instruction *as a matter of law*. Accordingly, we deny RTDI's pending motion to submit supplemental briefing on the issue of the applicable standard of review.

defendant's acts should extend." Id. at 289. "A defendant's conduct is not a proximate cause if, although it might otherwise have been a proximate cause, a superseding cause intervenes." State v. Meekins, 125 Wn. App. 390, 397-98, 105 P.3d 420 (2005). Washington courts regularly look to the Restatement (Second) of Torts in applying the doctrine of superseding cause. See, e.g., Campbell v. ITE Imperial Corp., 107 Wn.2d 807, 812, 733 P.2d 969 (1987); Herberg v. Swartz, 89 Wn.2d 916, 927-28, 578 P.2d 17 (1978); Anderson v. Dreis & Krump Mfg. Corp., 48 Wn. App. 432, 445, 739 P.2d 1177 (1987); Doyle v. Nor-West Pac. Co., 23 Wn. App. 1, 7, 524 P.2d 938 (1979).

The Restatement defines "superseding cause" as "an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." Restatement (Second) of Torts § 440 (Am. Law Inst. 1965). Whether a third party's intervening act rises to the level of a superseding cause is an issue of cause in fact. State v. Frahm, 193 Wn.2d 590, 601, 444 P.3d 595 (2019) (citing Maltman v. Sauer, 84 Wn.2d 975, 982, 530, P.2d 254 (1975); McCoy v. Am. Suzuki Motor Corp., 136 Wn.2d 350, 358, 961 P.2d 952 (1998)); but see Campbell, 107 Wn.2d at 824 (Goodloe, J., dissenting) ("Superseding cause is a relevant factor in determining *legal causation*." (emphasis added)); Anderson, 48 Wn. App. at 442 ("The doctrine of superseding cause . . . limits the situations in which *legal causation* can be held to exist between two events." (emphasis added)). Accordingly, the question is ordinarily left to the jury but may be determined as a matter of law if reasonable minds could not differ. Frahm,

193 Wn.2d at 601. The relevant considerations for determining whether an intervening act constitutes a superseding cause are "whether (1) the intervening act created a *different type of harm* than otherwise would have resulted from the actor's negligence; (2) the intervening act was *extraordinary* or resulted in extraordinary consequences; [and] (3) the intervening act *operated independently* of any situation created by the actor's negligence." Campbell, 107 Wn.2d at 812-13 (citing RESTATEMENT (SECOND) OF TORTS § 442 (AM. LAW INST. 1965).

We conclude as a matter of law that RTDS's failure to implement the collar modification was not a superseding cause relieving RTDI of liability.

Campbell is instructive. In Campbell, Steve Campbell was working as a wireman with a crew for Snohomish County Public Utility District 1 (PUD). Campbell, 107 Wn.2d at 809. The crew was completing maintenance on a substation, including cleaning of the roof bushings on top of metal-clad switchgear. Id. The crew foreman went through the standard procedures for de-energizing the substation so the crew could safely clean the roof bushings. Id. at 810. Unbeknownst to the crew, one set of bushings remained energized after going through normal shutdown procedures due to an unusual wiring configuration manufactured by ITE Imperial. Id. Campbell was electrocuted when he reached down to clean one of those bushings, and he suffered serious injuries. Id.

Campbell sued ITE Imperial, alleging that its wiring configuration was unreasonably safe unless accompanied by a warning that the bushings could

remain energized even after normal shut-down procedures were followed. Id. at 810-11. The trial court instructed the jury that if Campbell's employer, PUD, was negligent in failing to discover and warn of the defect and take appropriate precautions, and if the PUD's negligence was " 'so unanticipated that it can be said to fall without the realm of reasonable foreseeability' " by ITE Imperial, then PUD's negligence would be a superseding cause, thus relieving ITE Imperial of liability. Id. at 812. The jury returned a defense verdict, and on direct appeal to the Supreme Court, Campbell argued the trial court erred by giving the jury a superseding cause instruction. Id.

Our Supreme Court agreed with Campbell and reversed. Id. at 817. In so doing, the court concluded that the PUD's negligence in failing to warn its employees was reasonably foreseeable. Id. at 814. The court went on:

> Viewed differently, the intervening negligence of the PUD did not result in a different kind of harm than otherwise would have resulted from ITE Imperial's failure to warn. *The harm caused by PUD's negligence—electrical shock and burns—is identical to the harm brought about by ITE Imperial's failure to warn.* Secondly, the intervening negligence of the PUD did not operate independently of the situation created by ITE Imperial's failure to warn[;] . . . *the PUD's negligence was "activated" by ITE Imperial's failure to affix a warning to its product.*

Id. at 815 (emphasis added) (quoting Herberg, 89 Wn.2d at 928).

Here, as in Campbell, RTDS's alleged intervening negligence did not result in a different kind of harm to West than otherwise would have resulted from RTDI's conduct. Rather, the harm brought about by RTDS's intervening failure to implement the collar modification is *exactly the same harm* the risk of which was increased by RTDI's conduct in allegedly designing or manufacturing a defective

27

product and failing to warn of its danger: A catastrophic collision resulting from an axle housing fracture. Additionally, RTDS's conduct did not operate independently of the situation created by RTDI's conduct. Rather, as in Campbell, RTDS's alleged negligence was "activated" by RTDI's antecedent conduct in that the only reason RTDS was allegedly negligent was because RTDI's product was allegedly defective. Furthermore, that RTDS might not implement the collar modification cannot reasonably be characterized as an "extraordinary" occurrence. See Smith v. Acme Paving Co., 16 Wn. App. 389, 396, 558 P.2d 811 (1976) ("Only when the intervening negligence is so highly extraordinary or unexpected that it can be said to fall without the realm of reasonable foreseeability as a matter of law, will it be held to supersede defendant's negligence."). For these reasons, we hold as a matter of law that RTDS's decision not to implement the collar modification was not a superseding cause relieving RTDI of liability.

Our holding finds support not only in Campbell, but also in the Restatement (Second) of Torts, which provides:

> Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, *the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.*

RESTATEMENT (SECOND) OF TORTS § 442B (AM. LAW INST. 1965) (emphasis added). A comment to Restatement § 442B explains further:

> If the actor's conduct has created or increased the risk that a particular harm to the plaintiff will occur, and has been a substantial factor in causing that harm, it is immaterial to the actor's liability that

28

> the harm is brought about in a manner which no one in his position could possibly have been expected to foresee or anticipate. This is true not only where the result is produced by the direct operation of the actor's conduct upon conditions or circumstances existing at the time, but also where it is brought about through the intervention of other forces which the actor could not have expected, whether they be forces of nature, or the actions of animals, or those of third persons which are not intentionally tortious or criminal. *This is to say that any harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk, is always "proximate," no matter how it is brought about, except where there is such intentionally tortious or criminal intervention, and it is not within the scope of the risk created by the original negligent conduct.*

Id., Comment b (emphasis added). Cf. Doyle, 23 Wn. App. at 7 ("[E]ven if the intervening acts were as a matter of law unforeseeable, *there would remain the question of whether the harm was within the risk created by [the antecedent actor's] negligence*." (emphasis added) (citing RESTATEMENT (SECOND) OF TORTS § 442B)). Here, the harm caused by RTDS's failure to implement the collar modification fell squarely within the scope of the risk created by RTDI's original negligent conduct. Accordingly, RTDS's failure to implement the collar modification, however unforeseeable by RTDI, does not relieve RTDI of liability.

Furthermore, with regard to West's failure-to-warn claim, this case also falls within the coverage of § 449 of the Restatement, on which the Campbell court also relied: "Under § 449, even criminal conduct of a third party does not constitute a superseding cause '[i]f the likelihood that a third person may act in a particular manner is . . . one of the hazards which makes the actor negligent'." Campbell, 107 Wn.2d at 815 (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 449 (AM. LAW INST. 1965). Here, as was the case in Campbell, the likelihood that RTDS would not implement the collar modification

29

(or take some other action in response to the service bulletin) is one of the hazards that made RTDI's service bulletin allegedly inadequate. See id. ("In this case, the likelihood that the PUD would not properly shut down the . . . bushing is the very hazard which makes ITE Imperial's switchgear unreasonably safe if unaccompanied by an adequate warning. Accordingly, under § 449 the PUD's negligence does not constitute a superseding cause."). For the foregoing reasons, we conclude as a matter of law that RTDI was not entitled to a superseding cause instruction and, thus, the trial court did not err by refusing to give one.

RTDI disagrees and chiefly relies on Little v. PPG Industries, Inc., 19 Wn. App. 812, 579 P.2d 940 (1978), aff'd as modified, 92 Wn.2d 118, 594 P.2d 911 (1979), to argue it was entitled to a superseding cause instruction. In Little, Robert Little, a Bethlehem Steel employee, was overcome by and died from a chemical produced by PPG Industries after using the chemical to clean a poorly ventilated space. 19 Wn. App. at 814. The barrels in which PPG sold the chemical to Bethlehem Steel bore a warning advising, "Vapor may be harmful. Use with adequate ventilation. Avoid prolonged or repeated breathing of vapor." Id. Additionally, there was evidence that Bethlehem Steel had specific knowledge of the chemical's dangerous propensities, and Laverne Crossen, Bethlehem's representative in charge of employee safety, testified that before Little's death, Crossen had received a memo from the company's home office "advising him of two separate accidents involving four employees who were overcome and lost consciousness by overexposure to vapors from the solvent in

30

question" and reiterating the requirement for adequate ventilation. Id. at 825. Yet Crossen took no action with regard to the notice. Id. Based on the foregoing evidence, this court held the issue of superseding cause based on Bethlehem Steel's negligence should be presented to the jury on retrial. Id.

RTDI's reliance on Little is misplaced for three reasons. First, Little involved only failure-to-warn claims. See id. at 819. Nothing in Little suggests that a downstream buyer's failure to implement a recommended repair is a superseding cause with regard to the manufacturer's antecedent conduct in designing or constructing a defective product. Accordingly, Little does not support the proposition that RTDI was entitled to a superseding cause instruction with regard to West's design defect and construction defect claims.

Second, Little is distinguishable even with regard to West's failure-to-warn claims because Little involved an intervening act that directly contravened the manufacturer's specific instructions about how its otherwise *non-defective* product should and should not be used. Specifically, in Little, PPG had affixed a warning on its product advising Bethlehem Steel that "[v]apor may be harmful" and directing Bethlehem Steel that its inherently dangerous chemical should be used with adequate ventilation and that prolonged or repeated breathing should be avoided. Id. at 814. Bethlehem Steel's home office later reiterated the requirement for adequate ventilation. Id. at 825. Yet it nonetheless assigned Little to use the product in a manner directly contrary to those instructions. See id. In other words, Bethlehem Steel intervened by ignoring the manufacturer's specific instructions about how to use a non-defective product.

31

Here, by contrast, RTDI does not claim that RTDS intervened by ignoring a specific instruction about how to (or not to) use an otherwise non-defective Stretch Duck.  Rather, the service bulletin directed the reader to *repair* RTDI's already defective product.[10]  Furthermore, nothing in the service bulletin directed that Stretch Ducks be taken out of service or used a certain way until the collar modification was performed; rather, it recommended only that Stretch Ducks be taken out of service if wheel canting was observed.  Little is distinguishable on its facts.

Finally, in Campbell, our Supreme Court characterized the outcome in Little as anomalous:

> The manufacturer bears responsibility for affixing an adequate warning to its product, and this duty generally is not delegable. *Thus, it would be anomalous to hold that an employer's failure to warn constituted a superseding cause.  But see Little . . . .* Such a rule might improperly shift the duty of warning to product purchasers.  Although such a purchaser might be held jointly liable for breach of its duty to warn, its negligence generally should not relieve the manufacturer of liability for failure to warn.

Campbell, 107 Wn.2d at 814 (emphasis added; some citations omitted).

Accordingly, it did not adopt the principle that the court applied in Little, i.e., that

" '[w]here the buyer is notified of the danger, or discovers it for himself, and

---

[10] In this regard, the instant case is also distinguishable from two other cases on which RTDI relies.  See Taylor, 187 Wn.2d at 768 (trial court was within its discretion to give superseding cause instruction where doctor used defendant manufacturer's equipment to operate on obese patient with prior lower abdominal surgeries despite specific warnings not to use equipment on such patients); Minert v. Harsco Corp., 26 Wn. App. 867, 873, 875, 614 P.2d 686 (1980) (holding that trial court did not err by giving superseding cause instruction where plaintiff's employer failed to follow defendant manufacturer's instructions requiring scaffolding be stabilized).

delivers the product without warning, it usually has been held that the responsibility is shifted to him, and that his negligence supersedes the liability of the seller.' " Little, 19 Wn. App. at 824 (quoting WILLIAM L. PROSSER, TORTS § 102, at 667-68 (4th ed. 1971)). Instead, the Supreme Court in Campbell held that "[a]ssuming this court *were* to adopt this principle, it does not apply to this case." Campbell, 107 Wn.2d at 817 (emphasis added). It then distinguished Little on its facts, observing that Little involved an employer that "had actual, specific knowledge that the product was unreasonably unsafe, and that four employees had been overcome by the chemical on two previous occasions." Id. at 816.

In short, and contrary to RTDI's assertions, the Campbell court did not adopt a general standard wherein a non-employer's intervening act constitutes a superseding cause when the intervening actor had actual, specific knowledge that a product was unreasonably unsafe and failed to warn or protect the plaintiff. Rather, the Campbell court confined Little to its facts while not expressly disapproving of the specific outcome therein but acknowledging it as anomalous given the general rule that a manufacturer's duty to warn is not delegable. Because Little is distinguishable from the instant case for reasons already discussed,[11] we too confine Little to its facts and find it unpersuasive here.

---

[11] Although the parties do not discuss it, there is an additional policy based reason to distinguish Little. Little was decided in 1978, i.e., when Washington was still a joint-and-several liability jurisdiction. See Kottler v. State, 136 Wn.2d 437, 443, 963 P.2d 834 (1998) (explaining that in 1986, the Legislature abolished common law joint-and-several liability in most circumstances in favor of proportionate liability). And because Bethlehem Steel was an industrial employer, it almost certainly was immune from tort liability under Washington's

RTDI next argues that a superseding cause instruction was warranted because there was sufficient evidence from which a jury could find that RTDS's failure to implement the service bulletin was unforeseeable. But as illustrated by Campbell and by the Restatement (Second) of Torts § 442B, when it comes to a superseding cause analysis, the proper focus of the foreseeability inquiry is the nature of the *harm*, not the nature of the intervening *act*. Indeed, even RTDI's proposed superseding cause instruction recognized this stating, "It is not necessary that the sequence of events or the particular resultant injury or event be foreseeable. *It is only necessary that the resultant injury or event fall within the general field of danger which the defendant should reasonably have anticipated*." (emphasis added); see also 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 15.05, at 206 (2019). Where, as here, RTDS's intervening act resulted in exactly the same harm the risk of which was increased by RTDI's antecedent conduct, no reasonable juror would have found that the

---

industrial insurance laws. The Little court may well have been concerned with holding PPG fully responsible for Little's death given Bethlehem Steel's highly culpable conduct vis-à-vis its employee. Cf. Clark v. PacifiCorp, 118 Wn.2d 167, 190, 822 P.2d 162 (1991) (holding that under proportionate fault principles, third-party tortfeasors should be allowed to plead an employer's negligence as a partial defense to "prevent the employer from taking advantage of his own wrong"), superseded by statute as stated in Gilbert H. Moen Co. v. Island Steel Erectors, Inc., 128 Wn.2d 745, 759 n.7, 912 P.2d 472 (1996). Indeed, one commentator has listed Little among cases applying superseding cause in response to "the unfairness of holding a manufacturer liable for the entirety of an employee's injury when an employer's culpable or highly culpable conduct also caused the injury." Michael D. Green, The Unanticipated Ripples of Comparative Negligence: Superseding Cause in Products Liability & Beyond, 53 S.C. L. REV. 1103, 1133-34 & n.140 (2002) (positing that "there . . . is no need for superseding cause analysis . . . in those jurisdictions that have modified joint and several liability so that non-parties may be considered by the jury for apportionment of comparative responsibility").

harm fell outside the field of danger that RTDI should reasonably have anticipated. RTDI's argument fails as a matter of law.

*C. Instruction on "Product User"*

RTDI's final contention on appeal is that reversal is required because the trial court's Instruction 20 misled the jury by suggesting that RTDI's duty to warn extended to individual Duck passengers.[12] We disagree.

Under the WPLA, "[a] product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was . . . not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1). For purposes of a post-sale failure-to-warn claim,

> A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured where a manufacturer learned or where a reasonably prudent manufacturer should have learned about a danger connected with the product after it was manufactured. In such a case, *the manufacturer is under a duty to act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users*.

RCW 7.72.030(1)(c) (emphasis added).

---

[12] RTDI objected to this instruction by incorporating by reference the arguments it made during the Dinh Plaintiff Group trial. In the Dinh Plaintiff Group trial, RTDI argued, as a matter of *statutory interpretation*, that the term "product users" excludes passengers, who "no more 'use' the Duck than an airline passenger 'uses' a Boeing 737." On appeal, RTDI "abandons that specific contention," arguing instead that because no reasonable manufacturer in its position would have attempted to warn individual Duck passengers, no reasonable juror could find that RTDI breached its duty by warning only RTDS. RTDS does not contend that this argument is being raised for the first time on appeal, and thus, we reach the merits.

Here, the court, in Instruction 20, instructed the jury as follows:

> RTDI as a manufacturer has a duty to supply products that are reasonably safe.
>
> A product may be not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured.
>
> A product is not reasonably safe because adequate warnings or instructions were not provided after the product was manufactured if:
>
> 1. A manufacturer learned, or if a reasonably prudent manufacturer should have learned, about a danger connected with the product after it was manufactured;
>
> 2. Without adequate warnings or instructions, the product was unsafe to an extent beyond that which would be contemplated by an ordinary user; and
>
> *3. The manufacturer failed to issue warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.*
>
> *The duty to issue warnings or instructions is satisfied if the manufacturer exercises reasonable care to inform product users.*

(emphasis added).

RTDI asserts that as a matter of law, no reasonably prudent manufacturer in RTDI's position would have attempted to warn all Duck passengers that Stretch Duck axle housings could fail. Thus, RTDI contends, the trial court abused its discretion by refusing to give a proposed instruction that would have added, at the end of Instruction 20, "In this case, the product user is RTDS." Specifically, RTDI contends that without this additional sentence, the court's jury instruction "was misleading because it suggested that RTDI was required to warn Duck passengers, in addition to RTDS." We disagree.

As discussed, "[j]ury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." Bodin, 130 Wn.2d at 732.

"When these conditions are met, it is not error to refuse to give detailed augmenting instructions." Id.

Here, as RTDI acknowledges, Instruction 20 correctly stated the law. And contrary to RTDI's assertion, Instruction 20 does not suggest that RTDI was *required* to warn individual Duck passengers. Rather, it correctly instructed the jury that a manufacturer breaches its duty by failing to "act with regard to issuing warnings or instructions concerning the danger in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances," RCW 7.72.030(1)(c), but can satisfy that duty by exercising *reasonable care* to inform product users, which RTDI concedes on appeal could include passengers. Furthermore, had RTDI's theory been that despite not notifying NHTSA or issuing a recall, RTDI exercised reasonable care to inform product users by informing *only* RTDS, Instruction 20 would have allowed RTDI to so argue. Cf. Lunt v. Mt. Spokane Skiing Corp., 62 Wn. App. 353, 361, 914 P.2d 1189 (1991) (ski bindings manufacturer satisfied duty to warn end user by providing detailed warnings to equipment rental provider where manufacturer had reasonable basis to believe rental provider would pass along warnings). Instead, during closing, RTDI's counsel simply conceded that by not issuing a formal recall, RTDI breached its duty.[13] For these reasons, we hold that the trial court did not abuse its discretion by refusing to give RTDI's augmenting instruction. Cf. Anfinson v. FedEx Ground

---

[13] Specifically, RTDI's counsel argued, "So on this question on the special verdict form, warnings after the sale, you will have to say, I think, in fairness, that [RTDI] didn't meet its burden to provide the post-sale warning with this product. So you're going to answer this question yes."

Package Sys., Inc., 159 Wn. App. 35, 44, 244 P.3d 32 (2010) ("Jury instructions

are sufficient if they permit each party to argue their theory of the case, do not

mislead the jury, and when read as a whole, properly inform the jury of the

applicable law.  *No more is required.*" (emphasis added; footnote omitted)).[14]

RTDI disagrees and points out that the Restatement (Third) of Torts:

Products Liability provides:

> (a)  One engaged in the business of selling or otherwise distributing
> products is subject to liability for harm to persons or property
> caused by the seller's failure to provide a warning after the time of
> sale or distribution of a product if a reasonable person in the seller's
> position would provide such a warning.
> (b)  A reasonable person in the seller's position would provide a
> warning after the time of sale if:
>> (1)  the seller knows or reasonably should know that the product
>> poses a substantial risk of harm to persons or property; and
>> (2)  *those to whom a warning might be provided can be
>> identified* and can reasonably be assumed to be unaware of the
>> risk of harm; and
>> (3)  *a warning can be effectively communicated to and acted on
>> by those to whom a warning might be provided*; and
>> (4)  the risk of harm is sufficiently great to justify the burden of
>> providing a warning.

RESTATEMENT (THIRD) OF TORTS – PRODUCTS LIABILITY § 10 (AM. LAW INST. 1998)

(emphasis added).  RTDI relies on this section of the Restatement to assert that

no reasonable manufacturer in RTDI's position would have provided a warning to

Duck passengers because (1) "RTDI had no ability to identify potential Duck

---

[14] Because the panel may affirm on the basis that Instruction 20 was sufficient and not misleading, it need not consider RTDI's argument that the trial court erred by relying on Rublee v. Carrier Corp., 192 Wn.2d 190, 428 P.3d 1207 (2018), in reaching its decision.  See Young v. Toyota Motor Sales, U.S.A., 9 Wn. App. 2d 26, 37, 442 P.3d 5 (2019) ("We can affirm a trial court judgment on any basis within the pleadings and proof.").  Similarly, it also need not consider West's response that RTDI's argument "is a 'learned intermediary' argument by another name."

passengers or effectively communicate a warning to them" and (2) "even if RTDI could somehow reach potential Duck passengers, they were not in a position to act to prevent axle-housing failure."

But no Washington court has adopted this section of the Restatement to assess whether a manufacturer satisfied its duty under RCW 7.72.030(1)(c), and we decline to do so here.[15]

Furthermore, even if Instruction 20 were misleading (which it was not), RTDI fails to establish prejudice. See Keller v. City of Spokane, 146 Wn.2d 237, 249, 44 P.3d 845 (2002) ("Even if an instruction is misleading, it will not be reversed unless prejudice is shown."). RTDI points out that during closing West's counsel argued, with regard to RTDI's response to the July 2013 incident in which an axle housing failed during a Branson tour,

> [T]hey don't disclose to anybody, at least they don't disclose to Seattle what the real problem was, or that they had a Duck full of passengers in a vehicle where that axle housing fractured, and they don't notify the national governing board about it, they just do their own in-house thing. In fact, they don't do the recall, which we saw this morning that they were supposed to do, they just in-house fix it with the guys we saw on TV, Frank English and Brian Deckard.

RTDI contends, relying on Anfinson v. FedEx Ground Package System, 174 Wn.2d 851, 281 P.3d 289 (2012), that "the jury could well have taken this argument as suggesting that one of the ways RTDI breached its post-manufacture duty to warn was not issuing warnings to Duck passengers."

---

[15] Even in the Iowa case that RTDI cites in favor of adopting this Restatement section, the court adopted the factors set forth in § 10 only as "factors to consider" and recognized that "the particular facts of each case determine whether conduct is reasonable." Lovick v. Wil-Rich, 588 N.W.2d 688, 695-96 (Iowa 1999).

But Anfinson is readily distinguishable because there, one party's counsel took advantage of an ambiguous instruction by "actively encourag[ing] the jury to apply an erroneous legal standard." 174 Wn.2d at 876. Here, by contrast, West's counsel merely pointed to evidence from which a jury could reasonably infer, consistent with RCW 7.72.030(1)(c) and Instruction 20, that RTDI breached its duty by failing to act in the manner that a reasonably prudent manufacturer would have—not by failing to warn individual Duck passengers. And although the trial court did observe during the Dinh Plaintiff Group arguments regarding the "product user" issue that it was concerned about the jury reaching an "erroneous verdict," that statement does not necessarily mean, as RTDI asserts, that the trial court was worried about "holding RTDI liable on an improper basis." The trial court could just as likely have been concerned about the jury relieving RTDI of liability where liability should attach.

RTDI next suggests that the trial court's ruling would lead to absurd results. It asserts, "Under the trial court's ruling, every time Boeing sends its airline customers a service bulletin directing them to address a safety issue with its planes, Boeing will need to publish advertisements for an indefinite number of years afterward to notify potential airline passengers about the issue and recommend that they check with their airline before flying to make sure the airline took the necessary steps to address the problem." RTDI is incorrect. Under the trial court's ruling, and consistent with the WPLA, a manufacturer like Boeing need only act as a reasonably prudent manufacturer in the same or similar circumstances would act.

40

<u>RTDS's Appeal</u>

In its appeal, RTDS argues the trial court erred by: (1) denying RTDS's motion for judgment of law; (2) denying RTDS's motion in limine to exclude evidence that RTDS had a duty to implement the collar modification; (3) denying RTDS's motion in limine to exclude evidence of staffing issues in its maintenance department; and (4) allowing West to testify to medical causation. We discuss each of these alleged errors below.

*A. Judgment as a Matter of Law*

RTDS contends that there was no evidence from which the jury could find that RTDS breached its duty to West, and thus, the trial court erred by denying RTDS's motion for judgment as a matter of law. We disagree.

West alleged that RTDS was negligent. To prevail on her negligence claim, West was required to establish " '(1) the existence of a duty to [West], (2) a breach of that duty, (3) a resulting injury, and (4) the breach as the proximate cause of the injury.' " <u>Meyers</u>, 481 P.3d at 1088 (internal quotation marks omitted) (quoting <u>N.L. v. Bethel Sch. Dist.</u>, 186 Wn.2d 422, 429, 378 P.3d 162 (2016)).

It is undisputed that RTDS is a common carrier. "[A] common carrier owes the highest degree of care to its passengers 'commensurate with the practical operation of its conveyance at the time and place in question' and 'consistent with the practical operation of its business.' " <u>Tortes v. King County</u>, 119 Wn. App. 1, 7, 84 P.3d 252 (2003) (internal quotation marks omitted) (quoting <u>Tinder v. Nordstrom, Inc.</u>, 84 Wn. App. 787, 796, 929 P.2d 1209 (1997)). Washington

has long recognized that a common carrier's duty to exercise the highest degree of care extends to " 'the selection, maintenance, inspection and use of its cars and their appliances.' " Leach v. Sch. Dist. No. 322, 197 Wn. 384, 387, 85 P.2d 666 (1938) (quoting Adduci v. Boston Elevated Ry. Co., 215 Mass. 336, 337, 102 N.E. 315 (1913)). Accordingly, if there was any evidence that RTDS failed to exercise the highest degree of care in maintaining or inspecting Duck 6, the trial court was required to submit the question of negligence to the jury. See Peterson v. City of Seattle, 51 Wn.2d 187, 192, 316 P.2d 904 (1957) ("If there is any evidence tending to show that the carrier failed to comply with the required standard of care, then the question of negligence must be left to the jury.") That said, "the duty or standard of care owed by a common carrier is not one of strict liability." Tortes, 119 Wn. App. at 7. "A common carrier is not the insurer of its passengers' safety, and negligence should not be presumed or inferred from the mere happening of an accident." Id. at 7-8.

Here, there was evidence from which a reasonable juror could find that, by not implementing the collar modification, RTDS breached its common carrier duty of care. The collar modification was recommended in a service bulletin issued by the manufacturer itself and that expressly stated its reason for release was to "avoid axle fractures." Multiple RTDS employees testified they understood the risk a potential axle housing fracture posed. Johnson testified that he understood that "if there are problems with the front axle or steering, that incidents could happen." Hoffman testified that from a mechanic's standpoint, the risk of a fracture was that a "[w]heel can come off," and he knew that if an axle housing

42

fracture occurred while a Stretch Duck was in operation, it could lead to a catastrophic accident. Hatten also testified that when an axle housing fracture occurs, it can lead to a catastrophic accident.

Furthermore, and although Hatten testified RTDS was not equipped to conduct the welding called for in the service bulletin, he also testified that on prior occasions, RTDS had hired outside welders for projects. English testified that after RTDI issued the service bulletin, he called Johnson to make sure that RTDS was taking care of it, and Johnson "responded that, yes, he would take care of it, that he had some kind of other issue that was too close to home, or something like that, on a rear wheel." English also testified that all of RTDI's licensees and franchisees other than RTDS implemented the collar modification.

Viewing the foregoing evidence in the light most favorable to West and RTDI, a reasonable juror could have found that by not implementing the collar modification, RTDS breached its common carrier duty of care.

RTDS disagrees and asserts that "[t]o establish a breach of duty, [West] had to establish that RTDS had the obligation to implement the collar modification because it was in general use, approved, and was necessary for passenger safety." RTDS cites Leach and Brown v. Crescent Stores, Inc., 54 Wn. App. 861, 776 P.2d 705 (1989), for the proposition that a common carrier's duty is *limited to* adopting approved appliances that are in general use and necessary for the safety of passengers.

But neither Leach nor Brown so holds. Rather, each case confirms that a common carrier has a duty to exercise a high degree of care in selecting,

43

maintaining, inspecting, and using its vehicles.  Leach, 197 Wn. at 387; Brown, 54 Wn. App. at 867.  While adopting approved appliances that are in general use and necessary for the safety of passengers is certainly one aspect of that duty, neither case holds that adopting such appliances is *the extent of* that duty.

Furthermore, Leach and Brown are distinguishable.  In Leach, the plaintiff argued that the defendant should have installed shatterproof glass in its school busses alleging that this kind of glass "was well known and easily obtainable in the open market, and had been in common use in school busses . . . for several years."  197 Wn. at 385.  In Brown, the plaintiff, who was injured when she was struck by a closing elevator door, argued that the elevator's owner should have installed photoelectric eyes in its elevators despite evidence that photoelectric eyes were not available at the time of the accident.  54 Wn. App. at 863, 867-68.  In each case, the court disagreed with the plaintiff, explaining that a common carrier "is not required to provide immediately and regardless of expense every new equipment that human skill and ingenuity devises to prevent accidents."  Leach, 197 Wn. at 387-88; Brown, 54 Wn. App. at 867-68.

The instant case is not a case about a common carrier that merely declined to implement "every new equipment that human skill and ingenuity devises to prevent accidents."  Instead, and viewing the evidence in the light most favorable to West and RTDI, this is a case about a common carrier that did not implement a modification despite the fact that the modification was specified by the manufacturer itself, urged to be completed no later than the beginning of the next tour season, and expressly intended to prevent a possible axle housing

fracture—an occurrence that the common carrier's own mechanics understood could be catastrophic. Leach and Brown do not control, and the jury did not need to find that the collar modification was approved, in general use, and necessary for passenger safety to find that RTDS breached its common carrier duty by not implementing it.[16]

RTDS argues that even if there was evidence from which the jury could find that RTDS breached its duty by not installing the collar modification, judgment as a matter of law was still proper because there was no evidence upon which a jury could reasonably find that breach was the proximate cause of the collision. But as discussed, English testified that all of RTDI's licensees and franchises other than RTDS implemented the collar modification. He also confirmed that before recommending the collar modification, RTDI had experienced five axle housing failures within a span of 10 years—an almost 10 percent failure rate among Stretch Ducks. And Herschend testified that he was not aware of any incidents involving any Stretch Duck axle housing on which the collar modification was implemented. Viewing this evidence and all reasonable inferences therefrom in the light most favorable to West and RTDI, a reasonable juror could find that had RTDS implemented the collar modification, the September 24, 2015 collision would not have occurred. Accordingly, judgment

---

[16] Because we affirm based on evidence of this alleged breach alone, we need not rely on evidence of the other alleged breaches West points to in her response brief, i.e., "failing to follow up with RTDI about performing the collar modification, failing to contact an outside welding vendor to perform the modification, failing to attempt effective inspections of axle housings, or failing to take Stretch Ducks out of operation until the axle housing defect was addressed."

as a matter of law was properly denied.

### B. Evidence of Duty to Implement Collar Modification

RTDS argues that reversal is required because the trial court erred by denying RTDS's motion in limine to exclude evidence that RTDS had a duty to implement the collar modification. We disagree for two reasons.

First, to support its argument, RTDS relies entirely on its assertion that RTDS was required to implement the collar modification *only if* it was an approved appliance that was in general use and necessary for passenger safety. But as discussed above, installation of such appliances is not the extent of a common carrier's duty.

Second, an evidentiary error requires reversal only if it is prejudicial. RTDS asserts that "[t]he admission of the evidence and argument about the collar modification was prejudicial error requiring a new trial." But RTDS does not provide any analysis for this conclusory assertion, nor does it provide references to "the evidence and argument" it asserts was prejudicial. See RAP 10.3(a)(6) (requiring argument to include references to relevant parts of the record). Therefore, even if the trial court erred in denying RTDS's motion in limine, RTDS fails to establish that reversal is required.

### C. Evidence of Other Maintenance Issues

RTDS contends the trial court erred by denying RTDS's motion in limine seeking to limit the introduction of evidence that RTDS had maintenance or safety problems. Specifically, RTDS contends that the evidence was inadmissible propensity evidence under ER 404(b). RTDS also contends the

probative value of that evidence was substantially outweighed by its potential for prejudice and, thus, it was an abuse of discretion to admit it. We hold that RTDS failed to preserve these contentions for appeal.

RTDS's motion in limine was narrowly focused on "mechanical issues other than those related to stretch duck axle housings." RTDS confirmed this during oral argument below, stating, "references to mechanical issues, other than those related to stretch Duck axle housing[s] should be excluded as irrelevant and propensity evidence." RTDS's counsel's argument also focused on specific mechanical failures:

> I think the Court expressed concern that if one digs really deeply into the specs of every single event that one argues is a maintenance failure it then begins to color – it allows the exception – the potential exceptions to become the rule. Because we can't say oh, let's go to, you know, April 21st, no failures. April 22, no failures. April 23rd, no failures. Because frankly that would be boring and cumulative. But on the other hand, if you are able to – if plaintiffs are able to highlight every single failure, regardless of whether it was a turn signal that went out, if it was a lug nut that didn't get tightened properly, if it was a rear axle shaft that tends to break, which is no fault of the maintenance department at all. It's a quirk of the vehicle. Then all of a sudden not only are we having an extraordinarily like then trial in order to sort things out, which is a huge waste of time under 403, but it's not going to the heart of the case . . . . [M]aybe some direction needs to be given . . . , otherwise we walk right into 404(b) and create each one of these failures as a microcosm of what our shop is about, and how we handled things.

And, RTDS proposed a resolution consistent with the trial court's earlier ruling in the Dinh Plaintiff Group trial:

> I think the way in which the Court balanced this in [Dinh], I think it was appropriate, not exactly what I asked for, but I think it was appropriate in that it allowed the plaintiffs to explore those issues, and issues in a grander sense of what staffing levels were required, what staffing levels should have been used in contrast to the fact that we did have the staffing levels of [RTDI] months before the

accident.

The trial court ultimately ruled, consistent with this proposal, that "specific incidents of things that weren't repaired" would be excluded as irrelevant, but that "the overall situation in your shop allegedly, that's fair game for plaintiffs, and it's fair game for [RTDI]."

In short, the only argument RTDS advanced below was that evidence of *specific mechanical issues* should be excluded, and the trial court agreed. Yet on appeal, RTDS contends that the trial court should *also* have excluded more generalized evidence that RTDS's maintenance department was understaffed or disorganized. RTDS did not make that argument below, and it also did not object on ER 404(b) or ER 403 grounds to any of the specific instances of testimony it now argues were prejudicial. Therefore, we decline to review the trial court's decision to admit that evidence. See RAP 2.5(a) ("The appellate court may refuse to review any claim of error which was not raised in the trial court."); ER 103(a)(1) (requiring timely objections "stating the specific ground of objection").[17]

D. Lay Testimony Regarding Boot

West wore a boot on her right foot during trial. According to West's husband, West started wearing the boot that week. During West's direct examination, her testimony about the boot was as follows:

Q.    . . . I see you have a boot.
A.    I do.

---

[17] West and RTDI also rely on the invited error doctrine to argue that this court should decline to review the trial court's decision to admit generalized evidence of RTDS's maintenance and staffing issues. Because we hold that RTDS failed to preserve error under RAP 2.5(a) and ER 103(a)(1), we need not decide whether the trial court's decision also constituted invited error.

Q.   I don't know if you can show your boot.  You have a boot on.
     Why do you have a boot on your foot, as you understand it?
A.   Yeah, on Mother's Day, I had – my foot started swelling, so I
     went into Same Day Care and they put me on some
     antibiotics.  They did an ultrasound and an X-ray.
Q.   And so what do you understand is the problem with the foot
     right now?
          [RTDI COUNSEL]:  I'm going to object, it calls for a
     legal – or excuse me, a medical opinion.
          THE COURT:  Not her understanding, okay.  Again,
     this isn't a medical opinion, it's just her understanding, folks.
     Go ahead and give your understanding.
A.   I saw another doctor . . . , and he said that –
          [RTDI COUNSEL]:  Objection, calls for hearsay.
          THE COURT:  Just tell us what your understanding is.
A.   My understanding, it's called a deep tissue infection.
Q.   And what do you understand is causing the deep tissue
     infection?
          [RTDI COUNSEL]:  Objection, your Honor, that calls
     for causation testimony.
          THE COURT:  Overruled.  It's just her understanding.
     You can go ahead and tell them.
          [WEST]:  Okay.
          THE COURT:  And again, it's not a medical opinion,
     folks.
A.   Not a clot, but there are little pockets that are remaining from
     my surgery have traveled to my foot.
Q.   You're talking about from your hip?
A.   From my right hip, have traveled to the foot.

On appeal, RTDS contends the trial court abused its discretion by allowing

West to testify as to her understanding as to the cause of her deep tissue

infection.  We conclude that although the trial court erred by admitting West's

testimony as to the cause of the infection, that error does not require reversal.

As an initial matter, West points out that only RTDI objected to her

testimony regarding the boot.  West contends that because RTDS did not

separately object, it failed to preserve review of the trial court's admission of her

testimony.  But under RAP 2.5(a)(3), "[a] party may raise a claim of error which

49

was not raised by the party in the trial court if another party on the same side of the case has raised the claim of error in the trial court." Because RTDI and RTDS were both defendants, RTDI's objection preserved the issue of West's testimony for appeal even though RTDS did not separately object.[18]

Turning to the merits of RTDS's challenge to the admission of West's testimony, we review the trial court's evidentiary decisions for abuse of discretion. Gerlach v. Cove Apartments, LLC, 196 Wn.2d 111, 119, 471 P.3d 181 (2020). "A trial court abuses [its] discretion when its ruling is 'manifestly unreasonable or based upon untenable grounds or reasons.' " Bengtsson v. Sunnyworld Int'l, Inc., 14 Wn. App. 2d 91, 99, 469 P.3d 339 (2020) (internal quotation marks omitted) (quoting Veit v. Burlington N. Santa Fe Corp., 171 Wn.2d 88, 99, 249 P.3d 607 (2011)). "However, '[e]videntiary error is grounds for reversal only if it results in prejudice.' " Id. (alteration in original) (quoting City of Seattle v. Pearson, 192 Wn. App. 802, 817, 369 P.3d 194 (2016)). " 'An error is prejudicial if within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " Id. (internal quotation

---

[18] Admittedly, our Supreme Court came to the opposite conclusion in State v. Davis, 141 Wn.2d 798, 10 P.3d 977 (2000), on which West relies. There, the court held, "Appellant cannot rely upon the objection of a codefendant's counsel to preserve an evidentiary error on appeal." Id. at 850. But RAP 2.5(a) was amended effective September 1, 1994 to add the language relating to the objection of a codefendant, and Davis relied on a pre-1994 case as authority for its holding. Id. at 850 n.286 (citing State v. Latham, 35 Wn. App. 862, 866-67, 670 P.2d 689 (1984)); see also 2A KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.5 author's cmts. at 264 (2014 ed.). Accordingly, and given the plain language of RAP 2.5(a)(3), we conclude the 1994 amendment was not brought to the Davis court's attention, and we decline to follow Davis in this regard.

marks omitted) (quoting Pearson, 192 Wn. App. at 817). "But improper admission of evidence constitutes harmless error if the evidence is cumulative or of only minor significance in reference to the evidence as a whole." Hoskins v. Reich, 142 Wn. App. 557, 570, 174 P.3d 1250 (2008).

Lay witnesses may not testify as to opinions or inferences that are "based on scientific, technical, or other specialized knowledge within the scope of [ER] 702." ER 701. Rather, if such testimony would be helpful to the jury, it must be given by "a witness qualified as an expert by knowledge, skill, experience, training, or education." ER 702.

Whether the swelling in West's foot was caused by a deep tissue infection and whether that infection was caused by West's most recent surgery are the subject of specialized medical knowledge. And it is undisputed that West was not a qualified medical expert. Furthermore, we are unpersuaded by West's contention that because her testimony was limited to her "personal understanding," it was a proper lay opinion. To accept this contention would be to allow an end-run around ER 702 simply by asking a lay witness to preface her testimony with "My understanding is . . . ." For these reasons, the trial court abused its discretion by allowing West to testify as to the medical cause of her foot swelling that necessitated a boot.[19]

---

[19] At oral argument, West's counsel relied on Brown v. Coca-Cola Bottling, Inc., 54 Wn.2d 665, 344 P.2d 207 (1959) to argue that West's testimony was properly admitted. But in Brown, the only objection to the plaintiff's testimony was a hearsay objection, whereas here, RTDI objected on both hearsay *and* medical causation (i.e., qualification) grounds. Accordingly, Brown is unpersuasive.

Nevertheless, reversal is not required because West's testimony linking her boot to her surgery (and thus the collision) was cumulative of other testimony linking her injuries from the collision to her ongoing ambulatory issues. Specifically, Singh testified that despite multiple surgeries, the seroma on West's hip "just won't go away." He also testified that West's ankle injuries were permanent, that West's prognosis was "poor," that West's hip seroma was causing persistent inflammation and resulting weakness in her hips, and that in light of West's pre-existing multiple sclerosis, Singh had concerns about a future of falls due to West's weakened hip and unstable ankle. Singh also testified that West had undergone physical therapy for her injuries and had not had a successful outcome to date.

West's husband testified that after West's surgeries, her seroma "was starting to grow again," that it would cause West shooting pains and limit her activities, and "it has continued to grow and grow and pains have gotten worse." He testified that West "can't walk very fast" and "can't walk any distance[, a]nd if she does, she pays for it later in the day." Matson testified, when asked about West's ability or inability to walk, "She walks very slow. She has to hold on to someone or something." She also testified that West walked with a limp that she did not have before the collision, and that she cannot sit for very long because "[s]he has to walk around and massage her bump."

In light of the other evidence that West experienced and would continue to experience ambulatory issues as a result of the September 2015 collision, we conclude that West's testimony was merely cumulative and did not result in

52

reversible prejudice.

RTDS disagrees and relies on <u>Smith v. Ernst Hardware Co.</u>, 61 Wn.2d 75, 377 P.2d 258 (1962), for the proposition that reversal is required.  In <u>Smith</u>, the trial court, for reasons unclear from the opinion, had reason to believe that improperly admitted testimony as to the cause of the plaintiff's sinus condition resulted in the jury increasing its verdict from $10,000 to $15,000.  61 Wn.2d at 76.  Thus, the trial court ordered a new trial after the plaintiff refused to accept judgment in the lower amount.  <u>Id.</u>  On appeal, our Supreme Court affirmed the trial court's decision, stating, "It would be sheer conjecture for this court to attempt to determine what value the jury placed upon the sinus condition or to conclude that the jury placed no value upon it at all."  <u>Id.</u> at 80.  RTDS relies on this statement to argue that reversal is warranted.  But RTDS's reliance is misplaced because in <u>Smith</u>, the trial court, which was in the best position to determine whether its error affected the verdict, had reason to believe it did.  Here, there was no such determination, and thus, <u>Smith</u> is factually distinguishable and does not control.  Cf. <u>Clark v. Teng</u>, 195 Wn. App. 482, 492, 380 P.3d 73 (2016) (observing that trial court is in best position to gauge prejudicial impact on jury, and appellate court requires a " 'much stronger showing of abuse of discretion to set aside an order granting a new trial than one denying a new trial' " (quoting <u>Teter v. Deck</u>, 174 Wn.2d 207, 222, 274 P.3d 336 (2012)).

In its reply brief, RTDI joins RTDS's challenge to West's testimony and cites <u>Thomas v. French</u>, 99 Wn.2d 95, 659 P.2d 1097 (1983), for the proposition

that reversal is required. In Thomas, three former students sued the Spokane School of Hair Design for breach of contract and CPA violations. 99 Wn.2d at 96-97. The former students claimed that they received little or no instruction even though they were promised one hour of instruction per day, that the school "was in a total state of confusion," and that contrary to statutory requirements, students were required to style hair for customers without supervision and before they completed 400 hours of study. Id. at 97-98. At trial, the court admitted, over the school's hearsay objection, a letter of complaint that was addressed to the Washington State director of licensing and signed by 18 students, two instructors, and a manager. Id. at 101.

Our Supreme Court held the trial court erred by admitting the letter. Id. at 104. It also held that reversal was required:

> The prejudicial value of the letter in the present case is evident on its face. Without a limiting instruction, the jury was free to accept the contents of the letter as true. *While the contents of the letter were somewhat cumulative of respondents' testimony at trial, the fact that several other persons signed the letter served to reinforce the credibility of respondents' statements.* Such reinforcement of their credibility may well have prejudiced the jury's assessment of respondents' testimony in other respects, especially as to damages for breach of contract and emotional distress. Because there is no way to know what value the jury placed upon the improperly admitted evidence, a new trial is necessary.

Id. at 105 (emphasis added).

In other words, the Thomas court expressly recognized that the cumulative nature of the letter weighed *against* reversal but ultimately concluded that reversal was required under the specific circumstances of that case—i.e., the lack of a limiting instruction and the fact that several other people signed the

letter, thus lending extra credibility to the three plaintiffs.

Here, as discussed, West's testimony regarding her boot was largely cumulative of testimony from other witnesses that she continued and would continue to experience problems with ambulation, and unlike in <u>Thomas</u>, nothing about the nature of West's testimony lent extra credibility to the testimony of other witnesses. This is particularly so given that the trial court expressly reminded the jury that West's testimony did not constitute a medical opinion, and the defense medical expert, Rousso, called West's causation testimony into question by testifying, "I don't know what in the world would cause" the swelling that West described. Accordingly, <u>Thomas</u> is distinguishable and does not require reversal.

<u>Fees on Appeal</u>

In a one sentence conclusion, West "asks this court to affirm and award her attorney fees and costs for this appeal." We deny West's bald request for fees. <u>See</u> <u>Stiles v. Kearney</u>, 168 Wn. App. 250, 267, 277 P.3d 9 (2012) (RAP 18.1 "requires more than a bald request for attorney fees on appeal."). West's request for costs should be directed to a commissioner or court clerk as provided in Title 14 RAP. We affirm.

_____
Coburn, J.

WE CONCUR:

_____            _____

55